2024 IL App (2d) 230056
No. 2-23-0056
Opinion filed May 10, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-1131 |
| ALONZO CAMPOS JR., | ) ) ) | Honorable James K. Booras, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Alonzo Campos Jr., was convicted of the May 17, 2019, first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)) of Mariana Castro-Tellez, also known as Mariana Reyes (Reyes), along with home invasion (720 ILCS 5/19-6(a)(1) (West 2018)), for which he received consecutive terms of imprisonment of 48 years and 25 years, respectively. On appeal, defendant challenges the sufficiency of the evidence to support his home invasion conviction, contending that no evidence was adduced to prove that he entered Reyes's residence without authorization. Defendant also contends that his sentence for Reyes's murder was excessive because it failed to account for his youth, his supportive family, his mental health and substance abuse issues, and his rehabilitative potential. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    We summarize the relevant facts appearing in the record. Reyes lived with her parents, Andres and Consuelo Castro, in a residence located on Cherokee Drive in Round Lake Beach. Reyes's two children, Juan Reyes (Juan) and Jessica Reyes (Jessica) also lived there. The house had a main floor, in which the kitchen was located, an upper floor, and a basement, in which Juan's bedroom was located.

¶ 4    During the winter of 2019, Juan purchased a BB rifle because he liked the look of the gun. Juan did not purchase BB pellets for the gun, he did not personally discharge the gun, and he was unaware that anyone else had ever shot the gun. He kept the BB rifle in his bedroom in the basement, and he was unaware that it had ever been removed from his room. In addition, Jessica testified that Juan kept the gun in his bedroom in the basement and that she had never observed anyone shoot it.

¶ 5    Defendant resided in a home on Passavant Avenue in Round Lake Beach. Defendant's residence was about a half-mile from Reyes's residence.

¶ 6    Juan and defendant attended the same high school during their sophomore year. During the summer of 2018, they both worked together at a restaurant construction job. During that summer, defendant drove Juan to their construction job several times a week. Five other people worked on the construction job with them. Through school and the shared job, Juan was familiar with defendant, his appearance, and his traits, such as how he moved and walked. In addition, the two had socialized at each other's homes.

¶ 7    Sometime toward the end of summer 2018, defendant asked Juan if he would pawn defendant's gaming console, a PlayStation 4, and give defendant the proceeds. Juan agreed and pawned the console, keeping the money and breaking off contact and communication with defendant. Defendant tried to contact Juan by phone and through Facebook but was ignored.

¶ 8    During the evening of May 16, 2019, Reyes was preparing for a church retreat she planned to attend the next day. Jessica testified that Reyes typically woke up around 6:30 a.m., and she often woke up earlier than that for church retreats. Reyes would also typically unlock the front door and start her car, return to the house to finish her preparations, and then leave for work.

¶ 9    Around 4:40 a.m., May 17, 2019, Jessica was awakened to the screams of Reyes. Jessica saw Reyes come up the stairs and go into Andres and Consuelo's room, crying for help and bleeding heavily. Jessica had her dog with her in her bedroom, but the dog did not bark that night. The dog had barked, however, when the home was previously broken into. Andres testified consistently with Jessica about Reyes's final moments. The three family members, Juan, Jessica, and Andres, all identified a kitchen knife—recovered by the police from a neighbor's yard—as one the family used in cooking. The knife was ordinarily kept in the kitchen, either in a drawer or in or near the kitchen sink, drying after it had been used.

¶ 10    The police collected evidence from the house. Two BB pellets were found on the kitchen floor, and two BB pellets were found on the first two stairs leading up to the second floor. No BB pellets or BB pellet containers were found in relation to Juan's BB rifle, and no carbon dioxide cartridges were found.

¶ 11    The evidence showed that Reyes had died from a stab wound to her heart. According to Dr. Mark Witeck, the forensic pathologist who performed Reyes's autopsy, she had a large stab wound to her abdomen and the knife pierced her heart, traveling from the bottom through the top and severing one of her coronary arteries. Such an injury was not instantaneously fatal, but death would occur in several minutes as her heart continued to pump the body's blood into her chest through the wounds in her heart muscle. Witeck also observed that Reyes had four small abrasions around her chest and shoulder and the abrasions were consistent with having been shot with BB pellets.

¶ 12    The police also recovered surveillance camera recordings from the neighborhood surrounding Passavant Avenue and Cherokee Drive. At around 4:25 a.m. to 4:35 a.m. on May 17, 2019, a man is seen walking toward Reyes's home. From about 4:35 a.m. to 4:40 a.m., the subject is seen running in the opposite direction, away from Reyes's home. From about 4:40 a.m. to 4:49 a.m., the subject is seen walking and running through the neighborhood toward defendant's Passavant Avenue residence. Juan identified the subject as defendant, basing his identification on his observations in the recordings of the subject's hair, overall facial structure, skin tone, and manner of moving and walking. Juan testified that his familiarity with defendant's appearance was gained in great measure during the 25 to 30 hours each week they worked together in the summer of 2018, during which time Juan was able to observe defendant and his movements.

¶ 13    Gerardo Villanueva, a neighbor, testified that, at around 5:30 a.m. on May 17, 2019, he discovered a knife in the grass in front of his house while he was waiting for a friend to pick him up for work. Villanueva was concerned that neighborhood kids could hurt themselves with the knife if they found it by the sidewalk, so he picked it up and tossed it over his fence and into his front yard. When he returned home from work, he learned that the police had collected the knife from his yard. The next day, Villanueva met with police and informed them that he had handled the knife. He also showed police the spot where he originally found the knife before tossing it into his yard.

¶ 14    Regarding the knife, Andres testified that he had purchased the knife and Juan and Jessica testified that they had seen it frequently used in meal preparation to chop vegetables and the like. Testing on the knife revealed the presence of Reyes's blood on the blade of the knife, and the presence of genetic material from at least three contributors on the handle. Reyes could not be excluded as the contributor of the largest fraction, and defendant could not be excluded as the

contributor of the next largest fraction. The smallest fraction remained unattributed, and Villanueva was excluded as a contributor to the genetic material on the knife handle.

¶ 15    Police quickly identified defendant as a suspect, and by the afternoon of May 17, 2019, defendant was in custody. The police collected evidence from defendant's Passavant Avenue residence, including items that resembled those worn and carried by the figure captured on the surveillance cameras early in the morning of May 17, 2019. In a ground-floor bedroom, police collected a backpack, a realistic looking Beretta-brand BB gun that was under a pillow, carbon dioxide cartridges, and a container of BB pellets. Testing on defendant's pants and jacket revealed some blood stains, but Reyes was excluded from contributing to any stains on defendant's pants, and the blood on defendant's jacket was not suitable for testing. Defendant's shoes did not have blood on them. Reyes was excluded from contributing genetic material to the Beretta BB gun, but defendant was not excluded from being one of the contributors of the genetic material on the trigger guard.

¶ 16    Officer Aldin Ejupovic, of the Round Lake Beach Police Department, transported defendant from the police department to the booking facility. Ejupovic's squad car created a video recording of defendant during the transportation to the booking facility. Ejupovic asked defendant his age, and defendant replied, "Twenty. I didn't mean to do it man. Do you think they will ever release me?" Ejupovic indicated that he had not clearly heard what defendant said, and defendant again replied, "I said do you think they'll ever release me?"

¶ 17    The State also introduced a recorded telephone call defendant made from the Lake County jail to his family. In it, defendant spoke with his father, mother, and two brothers. Defendant did not expressly admit guilt of the offense. Defendant also did not express remorse over Reyes's death, only remorse for the difficulties his actions caused his family.

¶ 18    Following the State's case, defendant moved for a directed verdict. On the home invasion charge, defendant argued that the State failed to prove that defendant knowingly without authority entered Reyes's dwelling, because there was no evidence of a forced entry and there was no physical or forensic evidence that defendant was inside the house or interacted with Reyes. The trial court denied the motion for a directed verdict.

¶ 19    In his case, defendant presented evidence of surveillance footage showing that, on May 13, 2019, Jessica and her boyfriend, Christopher Tinajero, were walking near the Reyes residence. Jessica and Tinajero had skipped school that day, and Jessica brought Tinajero to her home. Other footage from that day showed Tinajero walking alone in the Cherokee Drive neighborhood.

¶ 20    Following defendant's case, the jury returned a general verdict of guilty of first degree murder and it returned verdicts of guilty of home invasion (armed with a dangerous weapon) and home invasion (intentionally caused injury). Defendant filed a posttrial motion for a new trial, challenging, relevantly, the sufficiency of the evidence of his guilt of home invasion. On February 7, 2023, defendant's posttrial motion was denied.

¶ 21    Also on February 7, 2023, the trial court held a sentencing hearing. The only evidence presented at the hearing consisted of a victim impact statement from Reyes's brother, Raul Castro, and a written statement from defendant's family. Both statements were read in open court. Following argument, the court sentenced defendant to a 48-year term of imprisonment for murder and a concurrent 25-year term of imprisonment for home invasion. The court detailed its reasoning:

    "I considered the contents of the presentence investigation report, considered the evidence
        in aggravation, the evidence in mitigation, considered the facts adduced at trial, the
        evidence in aggravation consisting of a victim impact statement, and the evidence in
        mitigation consisting of a letter that was read into the record.

I cannot consider the fact that the defendant has exhibited remorse, except in a statement to a police officer. Furthermore, in terms of mitigation I cannot consider and state that the defendant does not have a criminal record. It's obvious from the presentence investigation report, and that's included, that the defendant has a criminal record. The defendant was on probation at the time that this offense was committed. Threatened serious harm to another, in other words, he caused the death of another individual. I don't know whether he did all of that under the influence of any drugs or alcohol, as [defense counsel] alluded to, but I cannot say that for this the drugs or alcohol are blamed. Perhaps of his mental state so far, I don't know what alteration the drugs and alcohol have caused. However, he did enter that home with the intent to commit harm. He entered that home armed with a BB gun. Even though it may not be a firearm, it does—it is a dangerous weapon. It can cause harm. And violated the—I have to agree with the State, the sanctity of somebody's house with—to collect a debt. All of that for a Play Station [*sic*]. How futile were those actions? There is nothing to—no substantial grounds tending to excuse or justify his actions that night.

The defendant, as I indicated, has a history of criminality, criminal conduct, and has a history of misbehaving in the jail too. I cannot find on the record that the character or attitude of the defendant indicates that he's unlikely to commit another crime.

Furthermore, I have considered and discussed some of the factors in aggravation when I enumerated the applicable factors in mitigation in that his conduct caused or threatened serious harm and that he has a history of delinquency[,] of criminality. And that there is a need to punish the defendant, as the State indicated, and deter others from committing the same type of offense.

The circumstances were such as that ripened into the killing of an individual. The defendant did not retreat, did not get out of the house, did not run away when he saw that someone was present in the house. He should have known that people were present in the house. He found an opportunity to get in there and he was going to get his way and did not hesitate in punching that knife into somebody's heart, into the victim's heart.

I think there is a sentence that's necessary to be imposed upon this defendant in order to protect the public and I indicated again and deter others from committing this type of offense. Thus, under the aggravating nature of the circumstances I will sentence the defendant to—for the offense of murder to 48 years in the Illinois Department of Corrections, and the offense of home invasion to 25 years, both sentences to run concurrent to one another."

¶ 22    Defendant timely appeals.

¶ 23                                II. ANALYSIS

¶ 24    On appeal, defendant contends that the evidence was insufficient to prove his guilt of home invasion beyond a reasonable doubt because the proof of an element of the offense, that he entered Reyes's home without authority, was lacking. Defendant also contends that his sentence for first degree murder was excessive. We address defendant's contentions in turn.

¶ 25                    A. Home Invasion—Sufficiency of the Evidence

¶ 26    Defendant challenges the sufficiency of the evidence regarding his conviction of home invasion. When reviewing a challenge to the sufficiency of the evidence, the reviewing court considers whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Jones*, 2023 IL 127810, ¶ 28. The reviewing court will not substitute its judgment for that of the jury regarding the weight of the evidence or the credibility of witnesses, and it will not

retry the defendant. *Id.* The reasonable inferences from the evidence must be drawn in favor of the State, and the defendant's conviction will not be overturned unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt. *Id.* Further, in weighing the evidence, the jury is not required to elevate all possible explanations consistent with innocence to a level of reasonable doubt. *Id.* ¶ 32.

¶ 27   The elements of home invasion as charged in this case in count IV are defendant, (1) who was not a peace officer acting in the line of duty, (2) knowingly, and (3) without authority, (4) entered the dwelling place of another, and (5) remained therein until (a) he knew or (b) had reason to know that one or more persons was present, (6) and while armed with a dangerous weapon, (7) used force upon a person within the dwelling place. 720 ILCS 5/19-6(a)(1) (West 2018). Defendant was also charged with home invasion in count V, comprised of, in addition to the same five elements as count IV, (6) intentionally caused injury to a person within the dwelling place (7) other than by personally discharging a firearm. *Id*. § 19-6(a)(2).

¶ 28   Defendant does not challenge the sufficiency of the evidence for any of the elements of home invasion except for the third element, that he entered Reyes's home "without authority." Thus, because defendant offers a sufficiency-of-the evidence argument on only the "without authority" element of home invasion, any sufficiency claims on other elements are forfeited for lack of development. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***.").[1]

---

[1]Likewise, defendant raises no issues and makes no arguments about his murder conviction, thereby forfeiting any claims about the murder conviction. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 29     Defendant argues that the State failed to prove that he entered Reyes's residence without authority. Our supreme court has clearly expressed that the key consideration in determining whether an entry into another's residence is without authority for purposes of home invasion is whether, at the time of the entry, the defendant intended to commit criminal acts. *People v. Bush*, 157 Ill. 2d 248, 254 (1993). The court explained:

> "No individual who is granted access to a dwelling can be said to be an authorized entrant if he intends to commit criminal acts therein, because, if such intentions had been communicated to the owner at the time of entry, it would have resulted in the individual's being barred from the premises *ab initio*. [Citation.] Thus, the determination of whether an entry is unauthorized depends upon whether the defendant possessed the intent to perform a criminal act therein at the time entry was granted. [Citations.] If *** the defendant gains access to the victim's residence through trickery and deceit and with the intent to commit criminal acts, his entry is unauthorized and the consent given vitiated because the true purpose for the entry exceeded the limited authorization granted. Conversely, where the defendant enters with an innocent intent, his entry is authorized, and criminal actions thereafter engaged in by the defendant do not change the status of the entry." *Id.* at 253-54.

¶ 30     Defendant argues that the State failed to prove that he entered Reyes's home without authority *i.e.*, that he possessed criminal intent at the time he entered. We disagree.

¶ 31     The most salient fact proved by the State is that defendant approached Reyes's residence armed with a BB gun. Further, defendant shot Reyes four times with the BB gun. From this, we can strongly infer that defendant intended to commit criminal acts in Reyes's home. Defendant argues that "mere possession of a BB gun is not illegal," citing *People v. Carpenter*, 368 Ill. App. 3d 288, 293 (2006), for the proposition that "[i]t is not a crime to possess a BB gun unless it is used in a dangerous manner." Defendant overlooks the fact that the BB gun *was* used in a

dangerous manner—defendant shot Reyes four times with it. The possession of the BB gun coupled with its dangerous usage strongly supports the jury's determination that defendant entered without authority.

¶ 32    Additionally, we note that the timing of the encounter suggests that defendant sought to surreptitiously enter Reyes's home. At approximately 4:25 a.m. on Friday, May 17, 2019, defendant was captured on surveillance recordings approaching Reyes's home. This time of early morning was about an hour before sunrise, and few people would be about to witness defendant's approach. The evidence showed that Reyes was often an early riser but typically arose around 6:30 a.m. There is no evidence that defendant had surveilled Reyes's home just prior to the offense or that he was aware of Reyes's habits and usual times of awakening and departing for work. Nevertheless, the predawn approach gives rise to the strong inference that he wished to avoid detection and observation and that he intended to reach Reyes's home before its occupants were stirring. This, too, supports an inference of malign intent, albeit not as strongly as defendant's arming himself with a BB gun. Taken together, the possession of the BB gun and the predawn approach lead to an inference of criminal intent.

¶ 33    Moreover, while the circumstances of the encounter between Reyes and defendant within Reyes's house are not conclusive, they, too, lead to an inference of criminal intent. At a minimum, defendant shot Reyes four times with the BB gun and used her kitchen knife to stab her in the heart. This conduct demonstrates that defendant prepared for violence before entering the house and supports a strong inference that, when he entered Reyes's home, he intended to engage in criminal conduct.

¶ 34    Further, the brevity of the encounter also supports an inference of criminal intent; it occurred in a few minutes, sometime between 4:30 and 4:40 a.m., suggesting that the encounter turned violent immediately upon defendant entering and that defendant was prepared for and

intended violence. This inference is further borne out by defendant's choice to arm himself with his BB gun before approaching and entering Reyes's home.

¶ 35    Based on these considerations, we conclude that the evidence is sufficient for a rational trier of fact to have determined beyond a reasonable doubt that defendant entered Reyes's home without authority. Accordingly, we reject defendant's argument.

¶ 36    Defendant argues that the State's closing argument conceded that it was "not likely" that defendant entered Reyes's home intending to kill her. From this, defendant attempts to insinuate that he had an innocent intent when entering and he developed his criminal intent only after he had entered the home. We disagree. Defendant need only have entered the home with criminal intent, such as to do violence to Juan or to steal something from inside the home—defendant need not have entered the home intending to commit a murder. As noted, defendant arming himself with a BB gun, the predawn approach, and the immediate escalation into violence all strongly support the inference that defendant intended to engage in criminal conduct when he entered Reyes's home, even if he did not intend to commit murder.

¶ 37    Defendant argues that inferring a criminal intent is speculative because there was no sign of forced entry, Jessica's dog did not bark, and defendant had a legitimate dispute with Juan that he could have been seeking to settle by his visit to Reyes's home. As noted above, when weighing the evidence, the jury is not required to elevate all possible explanations consistent with innocence to a level of reasonable doubt. *Jones*, 2023 IL 127810, ¶ 32. The lack of a forced entry is explained by the fortuity that Reyes arose earlier than usual to prepare for her church retreat beginning that day. The dog's failure to bark is unexplained in the record, but we note that the encounter was brief and defendant entered the house apparently without having to force open the door. That the dog barked at a previous and apparently unrelated burglary attempt is perhaps explained by the would-be burglar forcing open a door or window, where here, Reyes was moving about the house

and defendant did not make an unusual disturbance when entering the home. Thus, the likely explanation for the dog's silence is reasonably inferable from the record. Defendant did have a legitimate dispute with Juan about the proceeds from pawning defendant's PlayStation 4. However, the extremely early predawn encounter does not suggest that defendant visited Reyes's home innocently. Likewise, defendant's choice to arm himself with a BB gun does not suggest that he simply wished to peacefully discuss obtaining the proceeds from the pawning of the PlayStation 4. Considering all of the circumstances, the jury was not required to forgo common sense and common human experience and elevate specific facts over the picture painted by those circumstances. We reject defendant's argument.

¶ 38    Defendant specifically labels as speculative the State's closing argument remarks that defendant approached Reyes's home with the intent to "do something to Juan, take something of Juan's, burglarize the house, steal something, take something back, find the money from the stolen PlayStation." Defendant instead characterizes his approach as "simply seeking to speak in person with Juan or Juan's mother, [Reyes], about a monetary dispute after Juan had admittedly ignored [defendant's] phone calls and Facebook messages asking about the issue." Defendant, unlike the jury, ignores the inconvenient circumstances that belie his claim: his choice to arm himself with the BB gun (that looked like an actual firearm), the surreptitious approach under the cover of the predawn darkness, and the brevity of the encounter once he arrived to meet with Juan, Reyes, or whichever unfortunate family member happened to be present. These circumstances point to the inference that defendant was prepared for and intending to commit violence upon arriving at Reyes's home. Further, these circumstances strongly point to the lack of innocent intent and the presence of criminal intent to settle the PlayStation 4 issue. A weapon is usually not taken to a meeting to inquire about a debt, and such a meeting is usually scheduled in advance (to help ensure that the debtor is both aware of and will be present for the meeting) rather than simply showing up

at 4:30 a.m. when the debtor is likely still in bed. These circumstances, plus the fact that defendant's encounter with Reyes immediately escalated into unspeakable violence (as evidenced by the very brevity of the encounter and the brief moments between defendant being recorded approaching Reyes's home and running from Reyes's home towards his own home), indicate that defendant possessed criminal intent, which rendered his entry into Reyes's home unauthorized.

¶ 39    Defendant argues that the State's remark during closing arguments that he had "never been invited into that house for any reason" was incorrect because Jessica testified that Juan had previously invited defendant into the home. From this, defendant attempts to insinuate that, because defendant was familiar to the family, he must have entered Reyes's home with authority. Defendant's insinuation is a *non sequitur*, and it fails to account for the fact that he chose to arm himself with a BB gun and approach the house well before anyone was usually awake. This is the sort of tangential argument that, while having some very slight bearing on an innocent explanation as to defendant's presence, the fact finder is not required to elevate to a level of reasonable doubt. *Jones*, 2023 IL 127810, ¶ 32.

¶ 40    Defendant argues that the State did not present evidence that "proved circumstantially or directly that [he] entered the residence without permission or with the intent to commit any criminal action," because there was no evidence of a forced entry and the "only motive supported by the evidence at trial was that defendant wanted to resolve the game console dispute." This claim is accomplished by ignoring the considerations we have consistently identified above: the BB gun, the time of the approach, and the brevity of the encounter. This is circumstantial evidence that squarely leads to the inference that defendant approached and entered the residence with malign intent, planning to commit some sort of criminal act therein, even if he did not set out intending to kill Reyes. This evidence supports the reasonable inference that defendant's entry was without authority. We reject defendant's contention.

¶ 41 Defendant next turns to the limited authority doctrine, which provides that consent given for a defendant's entry is revoked by criminal actions committed after entry, because the owner would not have granted entry if he or she knew of the defendant's criminal intentions. *Bush*, 157 Ill. 2d at 253-54. Authorization is thus determined at the time of the defendant's entry: if the defendant possessed a criminal intent at the time of entry, his entry is without authority, and if the defendant possessed an innocent intent at the time of entry, his entry is with authority, and any criminal actions committed thereafter do not change the status of the entry. *Id.* at 254.

¶ 42 We perceive that defendant is attempting to foreclose an argument that, because he engaged in violence after he entered Reyes's home, his entry is retroactively without authority. However, we have analyzed the circumstances to discern whether the jury could reasonably infer that defendant possessed a criminal intent at the time of his entry. Our determination thus comports with defendant's view—that the authority to enter is assessed by the defendant's intent at the time of his entry and is not affected by his criminal conduct after he has entered. Defendant further reiterates his contentions that the evidence was one-sided and showed that he entered with an innocent intent and that his criminal conduct once inside Reyes's home should not vitiate either the authority to enter or his original innocent intent. We have addressed those contentions above and need not do so again. We do address the additional wrinkles raised by defendant.

¶ 43 Defendant focuses on trickery and deceit as a means to gain entry (*People v. Peeples*, 155 Ill. 2d 422, 488 (1993)), arguing that any inference that he used a deceitful ploy to gain entry would be wholly speculative. We need not address this argument because the jury could reasonably infer that defendant possessed a criminal intent upon entry, and that is sufficient to establish the "without authority" element.

¶ 44 Defendant also argues that the predawn encounter is nothing unusual, because the time was dictated by Reyes's schedule and the earliness was dictated by her attending a church retreat that

day. This argument presupposes something entirely missing from the record: that defendant arranged to meet Reyes that morning. This is precisely the type of speculation that defendant accuses the State of engaging in during closing arguments and the jury of engaging in while determining that his entry into Reyes's home was without authority. The difference, of course, is that the State's argument and the jury's determination are based on reasonable inferences arising from evidence adduced at trial, while defendant's premise is based on no evidence in the record beyond Reyes's plan to attend a church retreat. We reject the premise and the argument.

¶ 45    Accordingly, we hold that the trier of fact could reasonably conclude beyond a reasonable doubt that defendant entered Reyes's home without authority.

¶ 46                                B. Excessive Sentence

¶ 47    Defendant argues that his 48-year sentence for first degree murder is excessive. Defendant bases his claim not on a contention that the trial court misapplied any factors in aggravation or mitigation, but on its purported failure to adequately consider his youth, his supportive family, his substance abuse and mental health issues, and his rehabilitative potential. We begin by discussing the principles that apply to our review.

¶ 48    The trial court has broad discretion in imposing a sentence, and its sentencing decision receives great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). Deference is given because the court is in the best position to observe the defendant and the proceedings, and it has the opportunity to weigh the relevant sentencing factors, such as the defendant's credibility, demeanor, general moral character, mentality, social environments, habits, and age. *Id.* at 212-13. This deference also means that the reviewing court must not substitute its judgment for that of the trial court because it would weigh the factors differently. *Id.* at 213. Therefore, a reviewing court will not disturb a defendant's sentence absent an abuse of discretion. *Id.* at 212. The trial court abuses its discretion if it imposes a sentence that is greatly at variance with the spirit and purpose

of the law or is manifestly disproportionate to the nature of the offense. *Id.* With these principles in mind, we turn to defendant's specific contentions.

¶ 49 As an initial matter, we note that defendant did not file a motion to reconsider his sentence. To preserve a claim of sentencing error, a defendant must make a contemporaneous objection and file a written postsentencing motion raising the issues. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Defendant, however, invokes the doctrine of plain error. For a defendant to obtain relief under the plain error doctrine, the defendant must show error and then that either the evidence at the sentencing hearing was closely balanced or the error was so egregious as to deny the defendant a fair sentencing hearing. *Id.* at 545.

¶ 50 Defendant argues that the evidence was closely balanced because he presented significant mitigating evidence. Defendant also argues that he may circumvent forfeiture under the second prong of plain error analysis, because the potentially excessive sentence affects his substantial rights. We consider these contentions in reverse order.

¶ 51 Defendant's argument regarding the second prong of plain error analysis cuts too broadly—so broadly, in fact, that it would make any excessive-sentencing claim reviewable under the second prong of the plain error doctrine. A defendant may not simply state that, because the trial court's sentencing decision affects his or her fundamental right to liberty, any error committed by the court is reviewable as plain error, because that would relegate the narrow doctrine of plain error (*id.*) to a mere shibboleth intoned to avoid forfeiture. Because any sentencing error will arguably affect the defendant's liberty, determining whether the claimed error may be reviewed as plain error requires a more in-depth analysis. *People v. Rathbone*, 345 Ill. App. 3d 305, 311 (2003). Here, defendant simply recites that any and all sentencing issues affect a defendant's substantial rights and must therefore be excepted from the doctrine of forfeiture, citing *People v. Owens*, 377 Ill. App. 3d 302, 304 (2007). According to defendant, no further analysis is needed—if the claim

of error involves sentencing, it is automatically reviewable as plain error. See *People v. Falcon*, 292 Ill. App. 3d 538, 541 (1997) ("whether a defendant's sentence is properly imposed is generally a question that concerns that defendant's fundamental constitutional right to liberty" and thus merits plain error review). We reject defendant's contention, not because misapplications of the law at sentencing are never reviewable as plain error, but because a defendant must provide some rationale beyond "sentencing error" before we may consider whether the claimed error is reviewable under the plain error doctrine. *Rathbone*, 345 Ill. App. 3d at 311 (the second prong of plain error is not a general saving clause and should be utilized only when the possible error is so serious that its consideration is necessary to preserve the integrity of the judicial process).

¶ 52 Turning to the first prong of plain error analysis, defendant argues that, because the evidence was closely balanced, this issue is amenable to consideration as plain error. Once again, under the first prong of plain error, we may consider a forfeited issue if the evidence at the sentencing hearing was closely balanced. *Hillier*, 237 Ill. 2d at 545. The defendant bears the burden of persuasion, and if the defendant fails to carry his or her burden, the procedural default will be honored. *Id.* Regarding the first prong of plain error analysis, defendant specifically argues:

> "The excessiveness of [defendant's] sentence is reversible under the first prong of the plain error doctrine because 'the evidence at the sentencing hearing was closely balanced.' [*Id.*] Although there was some aggravating evidence, the mitigating evidence here, as described above, was significant. The evidence at sentencing was thus closely balanced, and the Illinois Supreme Court has reviewed sentencing errors as plain error under similar circumstances. See, *e.g.*, *People v. Kuntu*, 196 Ill. 2d 105, 139-40 (2001) (reviewing sentencing error under the first prong of plain error because the defendant presented considerable mitigating evidence); *People v. Martin*, 119 Ill. 2d 453, 458-59 (1988) (reviewing sentencing error under the first prong of plain error where the

aggravating evidence at sentencing was counterbalanced by 'substantial mitigating evidence'). [Defendant] is, therefore, entitled to relief under the first prong of the plain error doctrine."

We have reproduced the entirety of defendant's argument regarding the first prong of plain error. Defendant's argument thus boils down to a claim that the trial court did not sufficiently consider or accord appropriate weight to the evidence in mitigation presented at the sentencing hearing.

¶ 53    Generally, a sentence falling within the statutory range is presumed to be proper. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 36. Defendant was eligible to be sentenced to a term of imprisonment between 20 years and 60 years. 730 ILCS 5/5-4.5-20(a)(1) (West 2018). We note that the State requested a 55-year term of imprisonment and the defense requested a 40-year term. The trial court sentenced defendant to a 48-year term, which was about at the mid-point of the recommendations and substantially less than the maximum allowable sentence.

¶ 54    We will not disturb a sentence falling within the statutory range for an offense unless the trial court has abused its discretion. *People v. Coleman*, 166 Ill. 2d 247, 258 (1995). Where the sentence falls within the statutory range, an abuse of discretion occurs where the court has imposed a sentence that greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense (*People v. Stacey*, 193 Ill. 2d 203, 210 (2000)), or where the sentence does not reflect adequate consideration of relevant factors in mitigation or the defendant's rehabilitative potential (*People v. Cavazos*, 2023 IL App (2d) 220066, ¶ 73). Nevertheless, so long as it does not ignore relevant factors in mitigation or consider improper factors in aggravation, the court possesses wide latitude in imposing a sentence. *Id*. We also presume that the court has considered all relevant evidence in mitigation, absent some affirmative indication to the contrary beyond the sentence itself. *People v. Brown*, 2017 IL App (1st) 142877, ¶ 64. The existence of mitigating factors neither requires the imposition of the minimum sentence

nor precludes the imposition of the maximum sentence; rather, the court must balance all relevant factors and reach a reasoned decision about the appropriate punishment in each case. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010).

¶ 55    First and foremost, defendant's argument for first prong plain error review mirrors his argument regarding second prong review. Defendant argues that the presence of mitigating factors renders the evidence presented at the sentencing hearing closely balanced and that, thus, the matter is susceptible to first prong plain error review. This argument is too broad and threatens to render the narrow plain error doctrine into nothing more than a meaningless rote recitation of magic words to secure review for forfeited sentencing issues—some deeper analysis is necessary to show how the evidence is closely balanced beyond the mere existence of mitigating factors. See *Rathbone*, 345 Ill. App. 3d at 311 (the plain error doctrine should not be a general saving clause permitting review of forfeited arguments without first providing more in-depth analysis). Because defendant's argument only asserts without demonstrating that the evidence was closely balanced, it fails to persuade.

¶ 56    In addition, at the sentencing hearing, the trial court noted that it considered the presentence investigation report (PSI), the evidence adduced at trial, the factors in aggravation and mitigation, and the evidence presented at the sentencing hearing, which consisted of a victim impact statement (evidence in aggravation) and a letter from defendant's family (evidence in mitigation). The court expressly articulated that certain factors in mitigation were not present; defendant did not exhibit remorse or lack a criminal record, nor could it be said that defendant's conduct did not threaten serious harm to another, that defendant was experiencing a serious mental illness at the time of the offense, that his mental health was affected by drug and alcohol usage, that he was unlikely to commit another crime or the situation was unique and would not recur, that he had no history of misbehaving in jail, or that there were grounds to excuse defendant's conduct. See 730 ILCS 5/5-

5-3.1 (West 2022). The court then noted that the evidence in aggravation showed that defendant had a history of criminal conduct, he intended to cause harm, and he was on probation at the time of the offense. See *id.* § 5-5-3.2. The trial court also considered the circumstances and seriousness of the crime and the need to deter others from committing the same type of offense and to punish defendant for his conduct. It then imposed a 48-year sentence for murder, which was about halfway between the sentences suggested by the parties (40 years from the defense and 55 years from the State).

¶ 57    Defendant contends that the trial court did not properly evaluate factors such as defendant's youth, "his insignificant criminal record," his supportive family, and his rehabilitative potential as illustrated by his "demonstrated ability" to work to improve his mental health and substance abuse issues. Defendant first contends that, because the court did not expressly mention how old he was at the time of the offense, it had failed to adequately consider his youth. However, the court was not required to detail for the record the process by which it arrived at an appropriate penalty. *People v. La Pointe*, 88 Ill. 2d 482, 493 (1981). The court considered the evidence and the prescribed factors and circumstances, and it delivered a reasoned explanation regarding its sentencing determination. The court was well aware of defendant's age, and we reject his contention.

¶ 58    Defendant next contends that the trial court improperly considered defendant's mental health and substance abuse issues, again, because they were not expressly analyzed as such. Defendant argues that the court's statement that it could not tell how seriously defendant was affected by substance abuse issues at the time of the offense means that it rejected all consideration of these issues when crafting defendant's sentence. We disagree. At trial, defendant claimed that the evidence tying him to the scene was lacking and his version of the offense was that he was not present at the murder and someone else, like Jessica's boyfriend, may have committed the murder, thus explaining the lack of evidence of a violent entry into Reyes's home. At sentencing, defendant

highlighted the mental health and substance abuse issues set forth in the PSI. The trial court recessed after the parties argued, and when it returned, it expressly noted that it had considered defendant's PSI in reaching its sentencing decision. The mental health and substance abuse issues were discussed fully in the PSI (which included reports from defendant's juvenile cases), and the court clearly articulated that it had reviewed and considered the contents of the PSI. Defendant's argument boils down to a dissatisfaction with the weight accorded his mental health and substance abuse issues. Defendant overlooks that, while mental health and substance abuse issues may be mitigating, they may also be aggravating, depending on how they are viewed. *People v. Madej*, 177 Ill. 2d 116, 138-39 (1997). Here, it is reasonable to infer that defendant had some mental health and substance abuse issues, and it is reasonable to infer that defendant was not taking advantage of the treatment opportunities given to him. It was thus within the court's discretion to view these issues as mitigating, aggravating, or even largely neutral. We therefore perceive no abuse of discretion in the trial court failing to accord those issues primary weight in its explanation, and we ourselves will not, and may not, reweigh the sentencing factors. *Cavazos*, 2023 IL App (2d) 220066, ¶ 74. We reject defendant's contention.

¶ 59    Defendant contends that his criminal history was minimal. Defendant's juvenile adjudications involved familial violence fueled or aggravated by substance abuse. In 2018, defendant was apparently looting cars, for which he entered a negotiated guilty plea. He was on probation for this adult conviction at the time of the instant offense. While we agree that defendant's criminal history does not show him to be "a sober-minded, cunning, malicious psychopath," he nevertheless possessed a criminal history, which the trial court duly considered. Indeed, the trial court stated, "in terms of mitigation I cannot consider and state that the defendant does not have a criminal record. It's obvious from the [PSI] report, and that's included, that the defendant has a criminal record." In discussing factors in aggravation, the court stated that

defendant "has a history of delinquency of [*sic*] criminality" and elaborated no further. Once again, we conclude that defendant is complaining about the weight accorded his criminal history, but from the court's remarks, it does not appear that the court over- or under-emphasized defendant's criminal history. We perceive no abuse of discretion, and we will not substitute our judgment for that of the court to reweigh this factor. *Id.*

¶ 60　Defendant last contends that the trial court did not appropriately consider defendant's rehabilitative potential. He suggests that the 48-year sentence improperly devalued that potential, which was evidenced by his attainment of a high school equivalency certificate and his family's representations about defendant valuing sobriety, as well as his making strides toward stable employment and housing after he received mental health and substance abuse services following his encounters with the juvenile justice system. While this is, of course, encouraging, we note that the most important factor in fashioning the appropriate sentence is the seriousness of the offense. *Flores*, 404 Ill. App. 3d at 159. Indeed, a defendant's rehabilitative potential is not entitled to receive greater weight in the court's sentencing calculation than the seriousness of the offense. *Alexander*, 239 Ill. 2d at 214.

¶ 61　Defendant went to Reyes's home intending harm. He was armed with a BB gun, which he used in his fatal encounter with Reyes. He also grabbed a knife he found in Reyes's kitchen and stabbed her through the heart. Reyes died in front of her parents and teenage daughter. The victim impact statement emphasized the effect on Reyes's family. We conclude that the offense in this case, the senseless taking of Reyes's life, was of the utmost seriousness.

¶ 62　We further note that defendant's argument would require us to reweigh the evidence and substitute our judgment for that of the trial court, and it would exalt his rehabilitative potential over everything else and deprecate the seriousness of the offense. This we cannot and will not do. *Id.* at 214-15. The trial court gave a clear and reasoned explanation as to how it fashioned

defendant's sentence. The trial court considered the seriousness of the offense and the factors in mitigation and aggravation, and the sentence was not contrary to the spirit and purpose of the law or manifestly disproportionate to the nature of the offense, being some 12 years less than the maximum and 8 years less than the State's recommendation. We discern no abuse of discretion.

¶ 63    Because the trial court did not abuse its discretion in fashioning defendant's sentence, defendant is unable to show an error, which is the first step in any sort of plain error analysis. *Hillier*, 237 Ill. 2d at 545 (to obtain relief under the plain error doctrine, a defendant must first show that the trial court erred). In the absence of such a demonstration that the court erred in passing sentence upon defendant, we honor the procedural default. Accordingly, we hold that defendant forfeited his sentencing contentions on appeal.

¶ 64    Defendant also seeks to evade forfeiture by contending that his counsel was ineffective for failing to perfect his sentencing issue by lodging a contemporaneous objection and filing a postsentencing motion. In order to prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *People v. Rollins*, 2024 IL App (2d) 230372, ¶ 20. Prejudice, in this context, means a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* Here, we have determined that the trial court did not abuse its discretion in passing sentence upon defendant. Thus, counsel's failure to preserve the claimed sentencing errors cannot have caused prejudice, as there was no abuse of discretion in the court's sentencing decision. Defendant cannot prevail on his claim that counsel provided ineffective assistance, and he cannot evade the bar of forfeiture.

¶ 65                                    III. CONCLUSION

¶ 66    For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 67    Affirmed.

*People v. Campos*, **2024 IL App (2d) 230056**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 19-CF-1131; the Hon. James K. Booras, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Lucas Walker, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Max Boose, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |