2024 IL App (2d) 230527-U
No. 2-23-0527
Order filed October 9, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-241 |
| NICHOLAS S. GRANDISON, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Kennedy concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's 21-year sentence for the beating death of the victim was not an abuse of discretion despite evidence of provocation by the victim and other mitigating factors.

¶ 2   Defendant, Nicholas S. Grandison, was charged with three alternative counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)). By agreement, the State dismissed the charges and defendant pleaded guilty to second degree murder (*id.* § 9-2(a)(2)). The parties did not agree on a specific sentence but agreed that, given defendant's criminal history, his minimum sentence would be 15 years' imprisonment. After a sentencing hearing, the court imposed a 21-year prison

term. Later, the court denied defendant's motion to reconsider the sentence. Defendant appeals, contending that his sentence is excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On February 26, 2020, the State indicted defendant for the first degree murder of Jonathan Wolfe, alleging that, on January 10, 2020, he struck Wolfe "about the head," thereby causing his death. On January 5, 2023, the parties presented an agreement to the court. The State would dismiss the charges of first degree murder and defendant would plead guilty to second degree murder, a Class 1 felony (*id.* § 9-2(d)), in that his conduct included all elements of first degree murder but that he acted in the unreasonable belief that the circumstances justified his act as self-defense (see *id.* § 7-1(a)). The parties agreed that, although the nonextended sentencing range for the offense was 4 to 20 years (730 ILCS 5/5-4.5-30(a) (West 2020)), defendant's prior convictions made him eligible for an extended sentence of not less than 15 nor more than 30 years (*id.*).

¶ 5      The parties presented the following factual basis. On January 10, 2020, defendant and Wolfe argued in the hallway outside Wolfe's apartment. The argument escalated into a physical altercation in which Wolfe pinned defendant against the hallway wall. The two men ended up in Wolfe's apartment, where defendant "repeatedly hit and kicked *** Wolfe about the head[,] causing his death." An eyewitness saw defendant "stomp *** Wolfe about the head" while Wolfe lay on the floor. A vodka bottle lay near Wolfe, and defendant feared that Wolfe would use it against him. The parties further stipulated that, "at the time of the incident[,] the defendant believed that he was justified in the extent of the force that he used, but the evidence show[ed] that his belief at that time was unreasonable."

¶ 6      The trial court accepted the plea agreement, found defendant guilty of second degree murder, and ordered a presentencing investigation report (PSIR).

¶ 7    The PSIR, filed February 17, 2023, stated as follows.  Defendant was born October 27, 1987.  On the evening of January 10, 2020, police and fire department personnel were summoned to an apartment, where they observed Wolfe lying in his bed, bleeding from his mouth and nose. He appeared delusional and did not want the police to intervene.  He was taken to the hospital.  On January 29, 2020, he died of his injuries.

¶ 8    A woman who had been in Wolfe's apartment at the time of the incident told the police that (1) someone knocked on the apartment door; (2) Wolfe walked out into the hallway and asked what the person wanted; and (3) moments later, Wolfe got pushed inside the apartment and fell to the floor.  The woman saw a man, later identified as defendant, punch and kick Wolfe while Wolfe was on the floor.  Several people were apparently waiting in the hallway for defendant, but they did not enter the apartment.  Defendant retrieved paperwork he had dropped during the fight and left the apartment.

¶ 9    The police investigation revealed that, at the time of the incident, defendant was soliciting sales at the apartment building on behalf of an energy company.  After the incident, his employer notified him that the police were looking for him.  Defendant spoke with officers at his workplace. He gave the following account (which we supplement here with the report he later gave to the PSIR writer).  When defendant knocked on Wolfe's door, he was unaware that his supervisor had done so earlier.  Wolfe opened the door, "got in [defendant's] face," started screaming at him, and used his stomach to pin defendant against the hallway wall.  Defendant smelled alcohol on Wolfe's breath.  Defendant could not get away, so he pushed Wolfe, causing Wolfe and defendant's paperwork to fall onto the floor of Wolfe's apartment.  While trying to get up, Wolfe grabbed an empty vodka bottle and held onto defendant's pants leg.  Defendant believed that his life was in danger, so he kicked Wolfe in his face and head.  Wolfe dropped the bottle and told defendant " 'to

get the f*** out.' " Defendant exited the apartment and he and a coworker in the hallway arranged for a ride from the apartment complex. About three weeks later, defendant called the police and learned for the first time that Wolfe had died from his injuries.

¶ 10    In 2021, while in jail, defendant got into a verbal altercation with another inmate and was placed in segregation for 30 days. On another occasion (no date provided), defendant was placed in segregation, but "the ticket was dismissed without sanctions."

¶ 11    The PSIR summarized defendant's history of delinquency and criminality. In September 2004, in Cook County, defendant was adjudicated delinquent of battery (bodily harm) and received a year of juvenile probation, which was terminated satisfactorily in September 2005. In October 2004, in Grundy County, defendant was adjudicated delinquent of residential burglary, but no sentencing information was available.

¶ 12    Defendant's adult record was as follows. In May 2005, he pleaded guilty to attempted robbery and received 18 months' probation, which was terminated unsatisfactorily in July 2006. In September 2005, defendant was arrested and charged with multiple offenses in four separate cases. In July 2006, he pleaded guilty to robbery (victim handicapped or over age 60), armed robbery (no firearm), and home invasion. He was sentenced to concurrent 12-year prison terms. According to police reports, defendant and two accomplices pushed their way into an apartment, where they punched the occupants, threatened them with knives, and took their wallets and cell phones. In March 2011, defendant was released and placed on mandatory supervised release (MSR). Two months later, he was arrested for burglary and, in November 2011, pleaded guilty and was sentenced to six years' imprisonment. In April 2014, defendant was released and placed on MSR. In January 2015, he was arrested for obstructing identification, a Class A misdemeanor; as of the PSIR date, the case was pending.

¶ 13    In September 2019, defendant was arrested for criminal trespass, assault, and disorderly conduct.  According to police reports, officers went to an apartment building after receiving multiple calls that a man was threatening to kill people.  At the scene, they saw defendant, who matched the callers' description, walking away from the scene.  Witnesses stated that defendant was "selling energy," became belligerent when asked to leave, and threatened to kill everyone in the building.  In October 2019, defendant pleaded guilty to criminal trespass, a Class B misdemeanor, and was sentenced to one year of conditional discharge, which he completed satisfactorily in October 2020.

¶ 14    The PSIR stated that defendant was the only child of Mesha Caudle.  She had never married defendant's father, who had not been in their lives since defendant was one or two years old. Caudle raised defendant in a stable environment.  Defendant married his wife, Angelica, in January 2016.  They had a six-year-old son and a three-year-old daughter, and he was stepfather to her 12-year-old twins.  Defendant reported attending high school from 2002 to 2004.  He had held the energy sales job for five and a half years when he was arrested in this case.  Defendant said that he had never been diagnosed with a mental health disorder and did not use illicit drugs or consume hard liquor.

¶ 15    The PSIR noted that Wolfe died of head injuries and that the autopsy indicated that he suffered a contusion to the forehead, a hemorrhage to the right side of his scalp, bone fractures in his face and skull, a left subdural hematoma, and a cerebral hemorrhage.

¶ 16    On April 3, 2023, the trial court held a sentencing hearing.  The State put on no evidence. Defendant called three witnesses.  Michelle Chonillo, an investigator for the public defender's office, testified that she reviewed a recording made by a police body camera on January 10, 2020. (The video is not in the record on appeal.)  In the video, according to Chonillo, Wolfe was

"conscious" and "combative," telling police officers that he did not want to go to the hospital or press charges. Hospital records showed that Wolfe's blood sample tested positive for alcohol, opiates, and benzodiazepine.

¶ 17 Chonillo testified that she "sought out more incidents, more police reports about [Wolfe]." She reviewed police reports for an incident on June 29, 2019. A woman told the police that Wolfe appeared at the home she shared with her fiancé. Wolfe was asked to leave but refused. He became "aggressive" and struck the fiancé twice with an oxygen tank. Chonillo also reviewed a deposition taken in a civil case involving defendant and Wolfe. The deposition cited an incident at Wolfe's apartment building. During this incident, Wolfe "was asked to go to his—to go back to his car. He was combative, aggressive. He was cussing, intoxicated. He got into a security guard's face and eventually did go into his car but was just very upset and intoxicated."

¶ 18 Caudle testified that, after defendant was released from prison in 2014, he resided at her home. He found part-time jobs and joined a life-coaching group, which appeared to increase his maturity and interest in self-help. After marrying, defendant supported his children and stepchildren. After defendant was taken into custody in this case, his children visited Caudle on weekends and had video conversations with him. The children greatly missed him.

¶ 19 Sara Price, a social worker for the public defender's office, testified that she had been counseling defendant since October 2020. He told her that his father had stopped being a part of his life after his parents separated when he was two. Price believed that, since she became his social worker, defendant had developed more empathy for his and Wolfe's families. He wanted to address his emotional issues and had improved in managing his anxiety.

¶ 20    In allocution, defendant took "full responsibility for [his] actions" and recognized that he had victimized not only Wolfe and his family but also his own loved ones. He said he was committed to reforming himself.

¶ 21    The State argued that defendant should receive the maximum sentence of 30 years. The State noted that, despite his stable upbringing and lack of mental illness or substance abuse, defendant had a lengthy juvenile and criminal record, including offenses committed while on parole.

¶ 22    Defendant requested the minimum sentence of 15 years. He argued that he had not contemplated that his conduct would cause Wolfe serious harm; when defendant left the apartment, Wolfe was still conscious and shouting at him. Further, defendant had acted on strong provocation; Wolfe initiated the altercation by confronting defendant, shouting at him, blocking his exit, and pinning him against the hallway wall, and defendant did not start kicking or hitting Wolfe until Wolfe threatened him with the vodka bottle. Also, defendant's offense resulted from circumstances that were unlikely to recur; when he first encountered Wolfe, he did not intend to commit any criminal act, but, rather, Wolfe's needless belligerence sparked the confrontation that led to his death. Moreover, defendant's imprisonment would put great hardship on his family, especially his children. Finally, defendant had taken responsibility for his acts, as he had pleaded guilty, spent years working on his emotional problems, and recognized in allocution that he must reform.

¶ 23    In pronouncing defendant's sentence, the trial court stated as follows. Rehabilitation required defendant to accept responsibility, which he had done by pleading guilty. The court "[found] that to be important." Turning to defendant's juvenile and criminal history, the court noted that he had committed some of the offenses when he was in his late teens and was now

thirty-five years old. The court stated that it wanted to impose a sentence that would "deter others, as well as [defendant] from finding themselves in these types of circumstances in the future."

¶ 24　The trial court observed that defendant acknowledged and regretted the harm his offense and incarceration would do to his loved ones. Upon leaving prison in 2014, he "went and did what [he] could to not be the person who goes back in." He had tried to get help, had found stability in marriage, and had worked to support his family. Defendant still had "certain issues" that "plague[d]" him, most notably controlling his temper, and he had worked on it "mostly successfully" but, "[a] couple of times maybe in 2019, 2020 less than ideally, to say the least."

¶ 25　As to the present offense, the court remarked that "[w]hat happened on January 20th, 2020, was a tragedy." Defendant's conduct was "wrong and unjustifiable" yet "in some ways understandable." It was "one of the few [homicides] where the offender left not knowing the victim was brutally injured." The court sentenced defendant to 21 years' imprisonment.

¶ 26　Defendant moved to reconsider his sentence, contending that it was excessive in view of his acceptance of responsibility, the harm that a lengthy prison term would cause his dependents, his lack of recent felony convictions, and the unique circumstances of the offense. The trial court denied the motion. On appeal, we remanded the cause for compliance with Illinois Supreme Court Rule 604(d) (eff. July 1, 2017). On remand, defendant stood on his original motion. The trial court denied the motion. This timely appeal followed.

¶ 27　　　　　　　　　　　　　II. ANALYSIS

¶ 28　On appeal, defendant contends that the trial court abused its discretion in sentencing him to 21 years' imprisonment for second degree murder. He argues that the court gave insufficient weight to the provocation under which he acted, his acceptance of responsibility for the offense, the absence of felony convictions between his 2014 release from prison and the present offense,

and the strong family support that enhanced his rehabilitative potential. For the following reasons, we hold that the trial court acted well within its discretion in imposing the 21-year sentence.

¶ 29 We may not alter a defendant's sentence unless the trial court abused its discretion. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A sentence is an abuse of discretion only if it is "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). We may not disturb a sentence merely because we would have weighed the pertinent factors differently from how the trial court did. *Id.* at 209. "We also presume that the court has considered all relevant evidence in mitigation, absent some affirmative indication to the contrary beyond the sentence itself." *People v. Campos*, 2024 IL App (2d) 230056, ¶ 54. "Since the most important sentencing factor is the seriousness of the offense, the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, and the presence of mitigating factors neither requires a minimum sentence nor precludes a maximum sentence." *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55.

¶ 30 Defendant argues first that the trial court minimized Wolfe's "extreme and aggressive" behavior as serious provocation under which defendant acted. See 730 ILCS 5/5-5-3.1(a)(3) (West 2020) (that "[t]he defendant acted under a strong provocation" is a mitigating factor). As the court heard the factual basis for the plea, we presume that it considered Wolfe's provocative behavior, and we may not disturb the sentence merely because we might have given this factor more weight. Further, although Wolfe did initiate the confrontation, the court could consider that defendant did not merely respond unreasonably but in fact repeatedly attacked Wolfe forcefully enough to cause facial and cranial fractures, a cerebral hemorrhage, and a subdural hematoma. Defendant's offense consisted of multiple violent acts, and the court could conclude that not all of them were strongly provoked by the victim, even if defendant committed them under a belief in the need for self-

defense. Finally, the court might not have credited all of defendant's uncorroborated account of what happened in the hallway before he inflicted his blows.

¶ 31 Defendant argues second that the 21-year sentence demonstrates that the trial court "did not meaningfully take into account the fact that [defendant] accepted responsibility for his actions, going so far as to agree to a 15-year minimum sentence." This argument fails. First, we must presume that the court considered defendant's acceptance of responsibility, as nothing in the record affirmatively shows otherwise. The length of defendant's sentence alone does not prove that the court insufficiently considered defendant's acceptance of responsibility (see *Campos*, 2024 IL App (2d) 230056, ¶ 54). Indeed, sentencing on the low end of the extended-term range of 15 to 30 years (see 730 ILCS 5/5-4.5-30(a) (West 2020)) strongly implied that the court fully considered this factor. Second, in pronouncing the sentence, the court expressly noted that defendant's acceptance of responsibility by pleading guilty was "important" to the court and would be a significant factor in the court's sentencing decision. The court also noted in defendant's favor that he recognized how his actions impacted his family and Wolfe's family.

¶ 32 Next, defendant notes that his most recent prior felony conviction was for an offense committed nearly a decade before the present one. Defendant does not actually contend that the trial court failed to consider this factor, and we presume the court considered it.

¶ 33 Moreover, defendant's argument implicitly concedes the existence of a major factor in aggravation: his lengthy and serious criminal record. See 730 ILCS 5/5-5-3.2(a)(3) (West 2020). His felony convictions alone include (1) attempted robbery, (2) home invasion, (3) robbery, (4) armed robbery, and (5) burglary. As further aggravation, he committed the burglary while on MSR (see *id.* § 5-5-3.2(a)(12)). Moreover, although defendant had no felony convictions for any acts committed between 2011 and 2020, he did have a conviction of misdemeanor criminal

trespass, which he committed only about four months before the present offense and while he was on MSR. As the State notes, he committed the trespass offense in circumstances similar to the present offense.

¶ 34 Last, defendant argues that the trial court failed to consider in mitigation that his prospects for rehabilitation are enhanced by support from his mother and his family. Defendant's family circumstances were noted in both the PSIR and the evidence in mitigation, and we presume the court considered them. Moreover, in explaining its decision, the court noted that, upon his last release from prison (in 2014), defendant had found stability in marriage and had worked to support his family. The court received considerable evidence of Caudle's concern and efforts on defendant's behalf and the steps he had taken to obtain life coaching and to cultivate an ongoing loving relationship with his wife and children. Moreover, the matter of family support was not altogether mitigating: the court noted that, despite Caudle's efforts and the presence of a caring family, defendant still had "certain issues" that "plague[d]" him, thus revealing the depth of his emotional infirmities and antisocial inclinations. Thus, defendant's argument essentially requests that we reweigh a factor in sentencing, which we shall not do.

¶ 35 We also note that defendant does not take issue with the trial court's application of a well-established factor in aggravation: that the sentence was necessary to deter others from committing a similar offense. See *id.* § 5-5-3.2(a)(7).

¶ 36 In sum, we find none of defendant's challenges to his sentence persuasive. More generally, we cannot say that defendant's low-end-of-the-range sentence was "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Therefore, the sentence must stand.

¶ 37                                III. CONCLUSION

¶ 38    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 39    Affirmed.