2025 IL App (2d) 230587-U
No. 2-23-0587
Order filed September 18, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-904 |
| JORGE A. MEDINA, | ) ) ) | Honorable Daniel B. Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court.
Justice Hutchinson concurred in the judgment.
Justice Birkett specially concurred.

**ORDER**

¶ 1    *Held*:  (1) Trial court erred in allowing the use of a co-defendant's prior consistent statement implicating defendant, as the statement was made after his motive to lie arose; however, the error was found to be harmless; (2) clothing that did not match descriptions or depictions of clothing worn by the shooter or were found, unused, in sealed containers, should not have been admitted into evidence; however, the admission of these items into evidence was harmless error; (3) the State's reference in rebuttal argument to defendant not getting "much sun over the past 18 months" was improper but held to be harmless error; (4) the evidence at trial was sufficient to prove defendant guilty of the charged offenses beyond a reasonable doubt; (5) trial court did not err in imposing sentences totaling 99 years imprisonment.

¶ 2 After a jury trial, defendant, Jorge A. Medina, was convicted of one count each of first degree murder (720 ILCS 5/9-1(a)(1) (West 2020)) and attempt (murder) (720 ILCS 5/8-4(a) (West 2020)). The trial court then sentenced defendant to prison terms of 45 years for first degree murder, with a further enhancement of 25 years for use of a firearm in committing the murder (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020)) and 29 years for attempt (murder). Defendant now appeals both his convictions and his sentences. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 On May 29, 2022, Stefan Filipovic and Rodrigo Quijada were shot as they stopped to talk to a friend as they walked home from Poppy's restaurant. Filipovic eventually died from a gunshot wound to the back of his head, while Quijada recovered from a gunshot wound to his head. Surveillance videos showed, and witnesses told police, that the shooter wore a black Nike hooded sweatshirt (with the hood up) with a large Nike swoosh on the front, gloves, a mask, dark gray or blue sweat pants, and white shoes. Two witnesses, including Quijada, said that the shooter was "dark-skinned" and possibly Hispanic. No witness interviewed at the site of the shooting was able to identify the shooter.

¶ 5 Video from cameras near the restaurant showed a gray BMW parking in front of the restaurant. Approximately eight minutes later, Filipovic and Quijada were shown walking up to the restaurant; Quijada entered the restaurant, while Filipovic sat outside.[1] Within a couple of minutes, the BMW pulled to the back of the parking lot before leaving. Subsequently, a doorbell camera recorded an unidentifiable person leaving what was later identified as defendant's house

_____

[1] The videos were from the same camera; however, the intervening eight minutes were not part of the exhibits.

and entering the BMW. Video from another home showed the BMW drop off the shooter about a block away from the restaurant just before the shooting. The car waited at the intersection outside the front of the restaurant until after the shooting, when it picked up the shooter, who was running away from the restaurant.

¶ 6    That evening, after a high-speed chase involving the BMW, police arrested Fernando Andino, who denied having any knowledge of or involvement in the shootings. A search of the car revealed an extended firearm magazine and ammunition. A search of Andino's cell phone revealed text messages with defendant and Angel Diaz, who was never charged in this case. Defendant was eventually charged after Andino gave a statement to the police describing the events leading up to the shooting and identifying defendant as the shooter. In a search of defendant's home, police collected two pairs of white gym shoes, a pair of gray sweatpants, a black ski mask, unused, still sealed in an unopened container two Nike hooded sweatshirts, and several other pieces of clothing, including three gloves that subsequently tested positive for gunshot residue. These items were admitted into evidence at defendant's trial.

¶ 7    At trial, Andino stated that he was testifying in exchange for a plea agreement with the State. Under this agreement, the State dismissed charges of murder, attempt murder, and fleeing and eluding against defendant in exchange for a plea of guilty to a charge of aggravated battery with a firearm and his truthful testimony at defendant's trial. Under the dismissed charges, he could have been sentenced to between 35 years and 75 years in prison, to be served at 100%. Under the agreement, he could be sentenced to between 6 and 30 years, to be served at 85%.

¶ 8    Andino was the only witness that connected defendant directly to the shootings. During his testimony, various security and home videos were shown, and Andino testified as to how what he said was reflected in the videos. He testified that, after he dropped his friends at the restaurant,

he saw someone sit down outside the restaurant and flash a gun at him as Andino sat in his car. Andino thought that the man was someone who had shot one of Andino's friends, who was in the restaurant, about a year before. He called defendant, whom he had known since high school, and picked him up because he needed someone with a gun and ammunition in case the man started shooting when Andino returned to the restaurant to pick up his friends. While he had a .45 caliber gun in his car, Andino had no ammunition.

¶ 9    Andino testified that he drove past defendant's house on a dead-end street, turned around in a driveway, then pulled forward to the stop sign at the corner. He called defendant to let him know that he was waiting outside. Defendant answered the call but did not immediately come out; defendant "was taking his time," so Andino called again to tell him to hurry. After answering this second call, defendant eventually came out. Andino described defendant as wearing a white shirt, gray Nike shorts, and white Air Force 1 gym shoes. However, defendant was carrying a black plastic grocery bag containing clothing and a gun. Defendant changed his clothes in the car, putting on dark gray Nike sweatpants and a black hoodie, along with a black ski mask and a pair of gloves. Defendant then put a Taurus G3 handgun, which Andino had seen before, in his hoodie pocket.

¶ 10    Andino had defendant get out of the car on Washington Park, about a block away from the restaurant; he did not want defendant to shoot from the car and make it identifiable. Andino then pulled forward to the stop sign at the corner just past Poppy's. He discovered that his friends had left the restaurant, and he tried to call defendant "like, four times" to have him come back, but defendant never answered. Andino heard two gunshots and looked in his rearview mirror to see two men drop to the ground. Andino drove away, making three right turns before he saw defendant and had him get into the car. Defendant told Andino, "I hit both of them. I had a FMJ [full metal

jacket bullet] in my clip [*sic*].***They both dropped." His gun had jammed; if it had not jammed, he "would have emptied the clip [*sic*]." Andino described defendant as happy.

¶ 11    As they drove towards Chicago, defendant took off the clothing that he had put on while driving toward the restaurant and put them, along with the gun, bag in the black bag. When they were in Highland Park, defendant asked Andino to drop him off at his house. They returned to Waukegan, and Andino dropped defendant off at his house. It was still daylight. Defendant took the bag of clothes and his gun with him. As Andino continued driving, he saw a squad car with its lights activated, and he sped off, because he still had his gun with him. He eventually threw the gun out of the window. He damaged his tire in making a turn and had to stop. He was then taken into custody.

¶ 12    On cross examination, Andino stated that, after he had been arrested at the conclusion of the car chase, he was taken to the police station. He agreed that he "didn't immediately tell t[the police] what happened." He was in custody for "two or three days." He only started telling the police a story after he was told that he was being charged in the shooting. He agreed that he "pled guilty in order to save [himself]" and that, if he did not testify the way that he "explained" that he was going to do, it could have adverse effects on his plea. He had "a job to do" in court that day, and he agreed that the "job is to come in and give us this story that you already gave us today." He had met with the state's attorney's office multiple times in the past several months "going over" his story "to make sure it fits."

¶ 13    On redirect examination, Andino agreed that he had told various people what happened on the day in question before testifying in court, and, every time, his story was consistent. He agreed that his "side of the bargain" was to tell the truth; if he did not tell the truth in court, there was no deal. His testimony was the truth.

¶ 14    During the course of his testimony, Andino stated that he had known defendant "for a while" and had driven him around in his car before. He was unsure of the last time defendant had been in his car before May 29, 2022. He testified both that he had been out of town for work "[a]bout four days" prior to the day of the shooting and that the last time that he had been out of state for work was May 28, returning May 29. When he travelled, he left his car in Chicago, were it remained "uncovered." Defendant's house was about three minutes away from Poppy's. Andino also admitted that he never saw himself in any of the videos, and the videos never showed what he was wearing that day.

¶ 15    The State entered into evidence a number of video recordings, obtained from various security and doorbell cameras, showing what was identified as Andino's car in various locations that generally corresponded with Andino's testimony regarding his travels and locations leading up to, during, and just after the shooting. No one in the car is identifiable.

¶ 16    The shooting of Filipovic and Quijada was shown from several different angles. Two of the videos, taken from doorbell cameras near the restaurant, show the shooter grabbing at the top of a handgun as he runs southbound away from the shooting. Officer Trevor McElroy testified that the video showed the shooter pulling the slide of the handgun; such an action would help one load or unload the gun or fix a jam, in which case pulling the slide would "potentially" eject a live round.

¶ 17    People's Exhibit 10 was a doorbell video taken from across the street and several buildings east of defendant's home, which was on the southwest corner of the intersection of Lloyd and Martin. Although the ticker providing the time of day that the video was depicting was not downloaded onto the version shown in the exhibit, Commander Jon Oliver, who obtained the video, testified that what was identified as Andino's car entered the video at 4:46 pm. An

unidentifiable person walks from the far side of defendant's house to the intersection of Lloyd and Martin immediately after Andino's car drives south on Martin through the intersection. The person waits for the car to come back towards the stop sign and approaches the driver's side of the car; he then walks around the car and enters the passenger side before the car pulls away. Oliver testified that he could not make an identification of the person who got into the car.[2]

¶ 18    People's Exhibit 4 showed doorbell camera video from the home at 44 Washington Park. Defendant's car is shown driving north on Washington Park, then pulling over on the right-hand side. A figure wearing a dark hoodie, gray pants, and white shoes exits the passenger side of the car. The car drives northbound and leaves the camera's sight. The figure walks northbound on Washington Park, eventually leaving the camera's sight. Approximately 2 minutes and 26 seconds after exiting the car, the figure can be seen running southbound on Washington Park, passing through the camera's range of sight. In People's Exhibit 9i, another doorbell camera from further south on Washington Park shows the hooded, masked figure running south on Washington Park, on the east side of the street. What was identified as Andino's car entered the video eastbound on a cross street and pulled up to the intersection with Washington Park, where the hooded figure entered the front passenger-side door of the car, which then pulled away.

¶ 19    Sergeant Stephan Driscoll of the Waukegan Police department assisted with the search of Andino's car. He conducted DNA testing on two swab cuttings taken from the inside of the

---

[2] Although Andino testified that he drove defendant back to his house while it was still daylight, there was no video of such a return to defendant's house. Oliver testified that the homeowner who had supplied the video in People's Exhibit 10 "had concerns" and did not want him to return after he had retrieved that video.

passenger side front door of Andino's car and compared them to defendant's standard. One swab was of human origin but did not contain enough DNA to move forward with further testing. The profile of the other swab revealed that it was from multiple (3) contributors, and further testing "favored exclusion" of defendant as one of the contributors.

¶ 20    Driscoll was also involved with the search of defendant's house that produced various items of clothing entered into evidence. Relevant to the clothing worn by the shooter in the videos and Andino's testimony, police discovered two pair of white Nike Air Force 1 gym shoes (one pair size 9 ½, the other size 8), two Nike sweatshirts (one black, one blue), two black ski masks (one unused, still sealed in an unopened container), a black neck gaiter, five "dark-colored work-type gloves," and gray sweatpants. No weapon was found in defendant's house. The house was unkempt, and there was no way to tell how long any items may have been in the places in which they were found. Further, he described all of the items as common.

¶ 21    All of the items were tested for the presence on gunshot residue. According to Shan Mei Jones from the Illinois State Police crime lab, three gloves were the only items that tested positive. Jones testified that it was not a difficult process to transfer residue particles from one object to another; further, "it has not been determined how long" particles remain on clothing.

¶ 22    The police bodycam video of Officer Brian Boudris shows a conversation with Noelia Medina, defendant's mother, shortly after the shooting. Noelia and defendant lived together. She approached an officer on the perimeter of the shooting scene because she had heard about the shooting on social media and was worried that defendant could have been a victim. She was unable to reach defendant, as his cellphone was still in his room, along with his wallet. Defendant had left the house before the shooting, but Noelia did not know with whom he had gone. Defendant had been wearing gray socks and grey Converse shorts before he left; he had been wearing a green

shirt before he left but, as she found that shirt in his room, she did not know what kind of shirt he was wearing when he left.

¶ 23    Boudris, an evidence technician, also processed the scene of the shooting. He located three spent shell casings and one live round; all were 9 millimeter. The live round was discovered on the sidewalk in front of the house directly south of Poppy's.

¶ 24    Noelia Medina testified that, on May 29, 2022, she and defendant had gone to lunch and gone shopping; they went to Home Depot "a little after 4:00 p.m." She did not remember him leaving the house after that. She learned about the shooting at about 5:00 on social media. She did not remember looking for defendant and being unable to find him, but she did remember calling him but not being answered. She did not feel that defendant always answered her calls. She did not remember her daughters calling defendant. She did call defendant's friend Angel, but it may have been accidentally. She did not remember what defendant was wearing on the day in question, and she did not remember looking in defendant's room, seeing defendant's wallet and cellphone but not seeing him. She had not been concerned that defendant had been involved in the shooting, and she did not remember driving to Poppy's and talking to Boudris at 5:25 p.m. She did, however, identify herself in a photo captured from Boudris" bodycam video.

¶ 25    Medina testified that one of her daughters had moved out of the house "not too long before" May, 2022, after she had graduated college with a degree in criminal justice. Her training involved going to the gun range and "being a part of investigations." Her daughter had "left some things behind in the house" when she moved out." Noelia also testified that her ex-husband had left some items behind when he moved out a couple of months before May, 2022.

¶ 26    Sergeant Alex Rasmussen testified that, in processing Andino's car, he developed seven fingerprints on the outside of the passenger-side front door of the car and one from the driver's

door. Nancy Keel of the Northeastern Illinois Regional Crime Lab testified that only three of the latent prints were suitable for comparison; only one print, lifted from the passenger-side door, was a match with defendant's exemplar.

¶ 27    Keel also stated that "any sort of rain or snow or moisture could also remove" a fingerprint left on the outside of a vehicle. The State then introduced a "certified document from the United States Department of Commerce related to the weather in May of 2022 in the Waukegan area." The document showed at least trace amounts, and up to 0.52 inches, of rain between May 24 and May 28, 2022.

¶ 28    Detective Sean Aines of the Waukegan Police Department testified that he transported defendant to the police station after arriving at defendant's house at 5:38 in the morning on May 30, 2022. Defendant told him that only he and his mother lived in the house; his father lived in Texas. At about 6:57 a.m., at the station, defendant gave Aines permission to search his cell phone. After turning on the phone, Aines noted that it "appeared to have been factory reset." It was in "a setup stage," giving prompts "to set up the phone as if you would have purchased it brand new." Further testimony by J.B. Brooks, an expert in cyber forensic analysis and, specifically, cellphone analysis, confirmed that defendant's cell phone had been factory reset at 5:43 a.m. on May 30, 2022.

¶ 29    Brooks also testified regarding Andino's cellphone. Andino's phone showed six attempted or completed contacts with defendant around the time of the shooting. At 4:41:14, Andino made a 33 second completed call to defendant, who then made a 34 second completed call to Andino at 4:42:00. Andino then completed calls of seven and nine seconds to defendant at 4:44:21 and 4:46:37. He then made two calls to defendant's phone that went unanswered at 4:50:55 and 4:51:08.

¶ 30    Later, defendant called Andino's phone via FaceTime at 6:11:10, and Andino called defendant via FaceTime at 6:27:10; neither call was answered.  The records of all of the calls involving defendant from 4:41 through 6:27 had been deleted from Andino's phone.

¶ 31                                II. ANALYSIS

¶ 32    We will first address defendant's contention that the trial court erred in admitting into evidence a prior consistent statement that Andino made to police.  In general, proof of a witness's prior consistent statement is inadmissible hearsay when used to bolster the witness's testimony.  *People v. Doehring*, 2021 IL App (1st) 19042, ¶ 100.  Such evidence tends to unfairly enhance the credibility of a witness, as a jury is more apt to believe something that is repeated.  *People v. Terry*, 312 Ill. App. 3d 984, 995 (2000).  However, such statements are admissible to rebut a charge or an inference that the witness was motivated to testify falsely at trial or that his testimony was of recent fabrication, where the witness told the same story before the motive came into existence or before the time of the alleged fabrication.  *Doehring*, 2021 IL App (1st) 19042, ¶ 101.  Prior consistent statements are only admissible for rehabilitative purposes and not as substantive evidence.  *Id*.

¶ 33    Illinois Rule of Evidence 613(c) (eff. Sept. 17, 2019), which codified this policy, provides:

   "(c) Evidence of Prior Consistent Statement of Witness.  Except for a hearsay statement otherwise admissible under evidence rules, a prior statement that is consistent with the declarant-witness's testimony is admissible, for rehabilitation purposes only and not substantively as a hearsay exception or exclusion, when the declarant testifies at the trial or hearing and is available to the opposing party for examination concerning the statement, and the statement is offered to rebut an express or implied charge that:

(i) the witness acted from an improper influence or motive to testify falsely, if that influence or motive did not exist when the statement was made; or

(ii) the witness's testimony was recently fabricated, if the statement was made before the alleged fabrication occurred."

¶ 34   Under either exception, the prior consistent statement must have been made before the alleged fabrication or motive to lie arose. *Doehring*, 2021 IL App (1st) 19042, ¶ 103. These exceptions do not require an explicit charge of recent fabrication or motive to testify falsely; even the suggestion of recent fabrication or motive to lie is sufficient to trigger the exception. *Id*. We will not reverse a trial court's ruling on the admission of a prior consistent statement absent an abuse of discretion. *Id*., ¶ 104.

¶ 35   After Andino testified, the State sought to admit an edited taped version of Andino's statement given to Detective Sean Aines on May 31, 2022. After initially having no objection to the use of the statement outside of editing and the possibility of a limiting instruction to the jury, defendant argued:

"[T]here were specific questions asked [during Andino's cross-examination] as to when this statement or as it was characterized 'this story' began, and it was the moment that he was charged with first degree murder. He was informed in this specific question, *You only came up with this story after you were informed that you were being charged with first degree murder*? Therefore[,] at that point the motive to fabricate was born, at that point.

* * *

So therefore the issue we're having is that we don't believe that [Supreme Court Rule] 613(c) would apply because the motive to fabricate was born at the moment he was told he was charged, and then the motive was to save himself,

- 12 -

which he clearly said several times yesterday during cross-examination, and that it continues to exist even at the time that the State comes to an agreement with him." (Emphasis in original.)

The State argued:

"The entire cross-examination dealt with our deal and that we—that he fabricated it in helping us and tailoring his testimony to our deal. So that opens the door to his prior consistent statement that he gave to police on May 31st of 2022. It's textbook."

¶ 36    The court then ruled:

"So the question comes back to in a Rule 613(c) context: Was the allegation of motive to fabricate that can trigger the admissibility of a prior consistent statement? What neither side has presented to the Court is an authority where there are two such motives or at least multiple motives, but it's the Court's finding based upon the facts of this case that—and the cross-examination as it played out—that the negotiation, the agreement with the cooperating co-defendant, that Andino made with the State in the last few months, whenever it was, that was the subject of such cross-examination is at least a sufficient motive to fabricate, that it permits the admissibility of his prior statement as a prior consistent statement."

¶ 37    The videotape of defendant's May 31, 2022 interview at the police station with Detective Sean Aines and Detective Daniel Ramirez was shown to the jury. Prior to Andino beginning his story of what occurred, the detectives made multiple statements to him, including: (1) "I think the decisions you are making right now are gonna [*sic*] determine the trajectory of how your life goes;" (2) "We are very aware of your involvement in this, it is pretty much crystal clear;" (3) "Your

explanation of things can change down the road what happens to you here;" (4) "We are confident we know who did the shooting, but you have to explain it to us***, otherwise we are not going to be able to help you;" and (5) "Sometimes, charges are dropped altogether." Andino then gave his statement, which the State characterizes as "largely cumulative to his trial testimony."

¶ 38 We conclude that the trial court erred in allowing the use of defendant's prior consistent statement. While the trial court hypothesized that, in this case, there were two motives for Andino to fabricate his testimony—the charges brought against him in 2022 and the later plea agreement "made with the State in the last few months, whenever it was"—Andino first made his statement implicating defendant in the shootings after he had been in police custody for "two or three days" and learned that he was being charged with murder and other offenses in the shootings. It was the knowledge of these charges and the possibility of "chang[ing] down the road what happens to you here" that would have been the impetus for Andino to fabricate a story, not the later plea agreement. The cross-examination of Andino regarding his plea agreement had to do with him testifying consistently with the story that he told police after being informed of the charges lodged against him. He had met with the state's attorney's office multiple times in the past several months to go over his story "to make sure it fits." His job in court was "to come in and give us this story that you already gave us today," and his failure to testify the way that he "explained" that he was going to could have adverse effects on his plea agreement.

¶ 39 A prior consistent statement must have been made before the alleged fabrication or motive to lie arose. *Doehring*, 2021 IL App (1st) 19042, ¶ 103. Here, Andino's consistent statement was made *after* his motive to lie—the criminal charges and the possibility of "help" or possibly the dropping of the charges—arose. Therefore, the trial court erred in allowing the use of the recorded statement.

¶ 40    While contending that the admission of Andino's prior consistent statement was proper, the State alternatively argues that any error in the admission of the statement was harmless. Where a trial court's error is not structural (*e.g.*, the complete denial of counsel or trial by a biased adjudicator), such error does not require an automatic reversal of a defendant's conviction. *People v. Mullins*, 242 Ill. 2d 1, 22 (2011). The harmless-error analysis is "based on the notion that a defendant's interest in an error-free trial must be balanced against societal interests in finality and judicial economy." (Internal quotation marks omitted.) *Id.* Reversal of a conviction based on the erroneous admission of a prior consistent statement is warranted only when "a reasonable probability exists that[,] but for the improperly admitted prior consistent statement, the jury would have acquitted the defendant." *Doehring*, 2021 Il App (1st) 190420, ¶ 119.

¶ 41    Our review of this evidence leads us to conclude that the evidence against defendant was sufficient to render harmless the error of admitting Andino's prior consistent statement. We note the importance of Andino's testimony, which was the only evidence to identify defendant as the masked, hooded person who shot the victims. Witnesses at the scene of the shooting, including the victims, were unable to identify the shooter. None of the numerous videos entered into evidence allowed for identification of the shooter or ever showed defendant as present at any stage of the crime.

¶ 42    However, there is sufficient evidence of defendant's guilt such that there is no reasonable probability that, but for Andino's improperly-admitted prior consistent statement, the jury would have acquitted defendant. See *Doehring*, 2021 Il App (1st) 190420, ¶ 119. Andino clearly identified defendant, whom he had known from high school, as the shooter. His trial testimony about his locations and travels from the time he first arrived at Poppy's parking lot to the time he picked up the shooter running away from the restaurant was largely corroborated by the extensive

video recordings entered into evidence. This included People's Exhibit 10, the video of Andino picking up someone from defendant's house just minutes before the shooter exited Andino's car near Poppy's and continued on to shoot the victims. However, the resolution on this video does not provide a physical identification of the person walking from defendant's house and getting into the car. Oliver testified that he could not make an identification of the person who got into the car, and our review of the video confirms that analysis.

¶ 43    Phone records from Andino's cell phone also generally corroborated Andino's testimony as it related to his phone calls with defendant, especially his attempts to call off defendant when he discovered that Angel and the others had already left Poppy's. However, neither the phone records nor Andino's testimony strictly comports with People's Exhibit 10, the video of the person being picked up at defendant's home. Andino testified that he drove past defendant's house, turned around in a driveway, then pulled forward to the stop sign at the corner. He then called defendant to let him know that he was waiting outside. Defendant answered the call but did not immediately come out; defendant "was taking his time," so Andino called again to tell him to hurry. After answering this second call, defendant eventually came out. However, People's Exhibit 10 clearly shows the unidentified figure walking from defendant's house just as Andino's car has cleared the intersection and is waiting at the intersection for the car to return to the camera's field of view. Andino's phone records show two quick calls to defendant's phone at about this time (4:44:21 and 4:46:37); however, only the second of those calls corresponds with Oliver's testimony that the car appears in the video at 4:46. Thus, People's Exhibit 10 fails to provide identification and also contradicts other evidence, including Andino's own testimony.

¶ 44    Further, there was evidence that defendant's cell phone had been factory reset at 5:43 a.m. on May 30, 2022, when police arrived to search defendant's home. "Evidence that the accused

has attempted to destroy evidence against himself is always admissible for the purpose of showing consciousness of guilt." (Internal quotation marks omitted.) *People v. Delhaye*, 2021 IL App (2d) 190271, ¶ 96 (where "the evidence demonstrated that defendant deleted the incriminating text-message exchange with Daniels from his cell phone before he provided it to the police."). This evidence clearly exhibited defendant's consciousness of guilt as to his use of his cell phone in setting up the shooting.

¶ 45    No weapon was ever recovered, and the search of defendant's home revealed neither a weapon nor any 9 mm ammunition. However, video showed that, as the shooter ran away from Poppy's southbound on Washington Park, he pulled at the slide of his handgun. There was testimony that such an action could be used to fix a jam in a handgun, and it could possibly eject a live round from the gun. A live round was found at that site. Andino testified that, after getting back into the car after the shooting, defendant told him that his gun had jammed; if it had not, he "would have emptied the clip [*sic*]." Andino's testimony about defendant's statement immediately after the shooting was supported by both video and physical evidence from the scene.

¶ 46    Andino's testimony about defendant's clothing when he picked up defendant was largely corroborated by Noelia Medina's description as contained on Boudris' bodycam video. Andino testified that defendant was dressed in a white shirt, gray Nike shorts, and white Air Force 1 gym shoes. On the video (although she later testified that she could not remember what defendant was wearing), Noelia said defendant was wearing gray socks and grey Converse shorts that day; he had been wearing a green shirt before he left but, as she found that shirt in his room, she did not know what kind of shirt he was wearing when he left. While differing on the brand of the shorts, both stated that defendant was wearing gray shorts. While not conclusive, the descriptions of defendant's clothing were not contradictory.

¶ 47    Various pieces of clothing similar to that seen on defendant at the time of the shooting were found during the search of defendant's home. Police discovered two pair of white Nike Air Force 1 gym shoes (each pair a different size), two black ski masks, a black neck gaiter, five "dark-colored work-type gloves" (three of which tested positive for gunshot residue), and gray sweatpants.[3] These items were described in testimony as common and in the State's closing argument as "non-distinguishable items." The unique hooded sweatshirt that the shooter wore, which the State described in closing argument as "more distinguished-looking," was not found in the search of defendant's home. As to the gloves, there was testimony that there was no way to determine when the gunshot residue was deposited on the gloves. Further, there was testimony from defendant's mother that her daughter, who had recently moved out of the house and had left items behind, had experience shooting guns as part of her college coursework. While some types of some of the clothing worn by the shooter were found in defendant's home, it provided very little evidence of identification of defendant as the shooter.

¶ 48    There was almost no physical or forensic evidence linking defendant to Andino's car. A single fingerprint of defendant's was found on the outside of the front passenger-side door of Andino's car. Andino stated that defendant had been in his car before, but that he (Andino) had been out of town for work before May 29. His testimony was unclear as to the length of his absence; he testified both that he had been out of town for about four days before May 29 and that he had last been out of town on May 28, returning on May 29. Keel testified that "any sort of rain or snow or moisture could also remove" a fingerprint left on the outside of a vehicle. The State then introduced the "certified document from the United States Department of Commerce related

---

[3] For a discussion regarding the admissibility of some other clothing found in the house, see *infra* ¶ 51 *et seq*.

to the weather in May of 2022 in the Waukegan area," showing at least trace amounts, and up to 0.52 inches, of rain in the Waukegan area between May 24 and May 28, 2022. However, Andino testified that his car had been left in Chicago in his absence. A Google search of the distance from Waukegan to Chicago results in a general answer of 46.7 miles. Thus, the existence of rain in Waukegan does not does not provide any evidence of rain washing away older fingerprints from a car parked in Chicago.

¶ 49     No evidence linking defendant to Andino's car was found inside of the vehicle. No fingerprints or DNA material linked to defendant were discovered inside the car. The only DNA sample that was suitable for testing revealed that it was from multiple contributors, and further testing "favored exclusion" of defendant as one of the contributors. This lack of evidence must be considered in the light of Andino's testimony that defendant got in and out of the car twice, changed his clothes inside the car twice, and was in the car for a round-trip drive between Waukegan and Highland Park.

¶ 50     While the physical evidence was not overwhelming, there certainly was sufficient evidence of defendant's guilt such that there is no reasonable probability that, but for Andino's improperly-admitted prior consistent statement, the jury would have acquitted defendant. See *Doehring*, 2021 Il App (1st) 190420, ¶ 119. Andino clearly and positively identified defendant, whom he had known for years, as the shooter. He detailed his own actions as they intertwined with those of defendant, and the multiple videos of the shooting and the neighborhood before and after the shooting largely correspond with Andino's description. Defendant's factory reset of his cellphone when the police arrived at his home, erasing all call history, surely shows consciousness of guilt, and Andino's erasure of his calls with defendant on the day in question also harmonizes with that evidence. As there was such evidence that there was no probability that, but for the improperly-

admitted prior consistent statement, the jury would have acquitted defendant, we conclude that the erroneous admission of the statement was harmless. Therefore, we grant defendant no relief on this basis.

¶ 51    Defendant next contends that the trial court erred in admitting into evidence certain items of clothing found during the search of his home. A trial court's evidentiary rulings are within the sound discretion of the court; and we will not reverse them on appeal unless the trial court abused its discretion. *People v. Maldonado*, 402 Ill. App. 3d 411, 416 (2010). " 'An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Id*. quoting *People v. Caffey*, 205 Ill.2d 52, 89 (2001).

¶ 52    Police removed from defendant's home two Nike hooded sweatshirts (one black, one blue), gray sweatpants, gloves, white Nike gym shoes, and two black ski masks. The trial court allowed the entry of these items into evidence, stating that "the standard under [Illinois Rules of Evidence] 401 is fairly low for relevance."

¶ 53    "Relevancy is established where what is offered as evidence has any tendency to make the existence of any fact in consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Peeples*, 155 Ill. 2d 422, 455-56 (1993). Some of these contested items of clothing had no such tendencies and were completely irrelevant to the facts or resolution of this case. One of the black ski masks entered into evidence was unused, still sealed in an unopened container. The two Nike hooded sweatshirts did not match the sweatshirt seen in the videos of the shooter or any description of the shooter.[4] These items, amongst others,

---

[4] We note that Nike was by far the largest sportswear brand in the world in 2022, with

were described by Sergeant Driscoll as "common." The State in essence conceded the irrelevancy of these items when it argued in closing that defendant "disposed of the firearm as well as the very more distinguished-looking sweatshirt with the Nike swoosh. He had spewed the other non-distinguishable items around the house." Items of the most popular sportswear in the world that did not match any description or depiction of clothing worn by the shooter and an item of clothing that could not have been worn, as it was still sealed, unused, in an unopened container, do not tend to make the existence of any fact in consequence to the determination of the action more or less probable, and their admission into evidence was erroneous. These items were not, as the special concurrence asserts, " 'strikingly similar' to the clothes worn by the shooter." *Infra*, ¶ 85.

¶ 54    Even cases relied upon by the special concurrence support our conclusion that the admission of some of these clothing items was error. For example, the special concurrence quotes *Hayden*, 387 U.S. 294, where the Supreme Court stated, "The clothes found in the washing machine *matched the description of those worn by the robber* and the police therefore could reasonably believe that the items would aid in the identification of the culprit." (Emphasis added.) *Infra*, ¶ 87. In this case, however, the complained-of clothing did not match the descriptions or, more importantly, video depictions of the clothing worn by the shooter. The sweatshirts were not the same color, and the logos on them were not the same; the shooter did not wear a black mask that was sealed in its unopened container. Similarly, *Mathes*, 101 Ill. App. 3d at 211-12, stated that "physical evidence may be admitted where there is evidence (either direct or circumstantial) to connect the evidence to the defendant *and the crime*." (Emphasis added.) See *infra*, ¶ 88. These

---

revenues exceeding $46 billion, almost double that of its nearest competitor, Adidas. See "Top 10 sportswear brands in the world," August 09, 2023, businesschief.com, (last viewed 08/15/25).

cases do not support the special concurrence's broad definition of relevant evidence, which would seemingly find as relevant and admissible an unopened package of white briefs if video of a defendant showed that he was wearing underwear, even though it was a pair of blue boxers (as both are underwear). Nevertheless, while we find that the entry of these items into evidence was error, we conclude, in light of the other evidence in this case, that the error was harmless, and we grant no relief on this basis.

¶ 55　Defendant also contends that he was unfairly prejudiced by the State's rebuttal argument. While prosecutors are granted wide latitude in delivering closing arguments, they may comment on only "the evidence and on any fair and reasonable inference[s]" that can be derived from that evidence. *People v. Perry*, 224 Ill. 2d 312, 347, 309 (2007). When reviewing argument for error, we look at the argument as a whole instead of focusing only on select phrases or remarks. *Id*. Improper remarks made during closing argument do not warrant reversal unless they substantially prejudice the defendant. *People v. Bona*, 2018 IL App (2d) 160581, ¶ 57.

¶ 56　While arguing regarding eye-witness descriptions of the shooter as "dark-skinned," the State said:

> "Also, as far as skin color goes, from everything you've heard in this case, it is a fair inference that the defendant has not had much sun over the past 18 months."

Defendant's objection was immediately sustained, with the trial court further stating, "You may argue the evidence and facts reasonably inferred from the evidence."

¶ 57　Defendant now argues that the State's argument was a direct reference to "the fact that [defendant] was in the custody of the county jail for the past 18 months" and denied defendant "his presumption of innocence." While we disagree with defendant that the State's argument was of

such import as to deny defendant the presumption of innocence, we do find that the argument was a crude attempt by the State to obliquely reference defendant's incarceration and was not, as the State now argues, invited fair comment regarding defendant's own argument that his skin was lighter than eyewitness descriptions of the shooter's skin tone. There is no fair inference to be drawn from the evidence as to why defendant "has not had much sun over the past 18 months" other than that defendant was confined indoors. Such argument cannot be condoned, and the assistant State's Attorney who made the comment is hereby admonished to refrain from such improper and faux clever comments in the future. In this case, the trial court immediately sustained defendant's objection to the comment, thereby curing the error. See *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 24 ("Any error resulting from the prosecutor's comments is usually cured when the trial court sustains objection or admonishes the jury." (Internal quotation marks omitted.))

¶ 58 Defendant also contends that the State failed to prove him guilty of the charged offenses beyond a reasonable doubt. When reviewing a challenge to the sufficiency of the evidence, we must consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This standard of review applies whether the evidence is direct or circumstantial and regardless of whether the defendant receives a bench or jury trial. *Id.* We will not substitute our judgment for that of the jury with regard to the credibility of witnesses, the weight to be given to testimony, or reasonable inferences to be drawn from the evidence. *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 101.

¶ 59 Defendant argues that the evidence in this case "was almost entirely circumstantial." Indeed, no firearm was ever recovered, no ammunition matching that used in the shooting was

recovered other than a single unfired cartridge found at the site of the shootings, and the most identifiable piece of clothing that the shooter was depicted as wearing was not found in defendant's possession. While no eyewitnesses to the shooting were able to identify defendant as the shooter, and numerous video tapes could not show the shooter's identity, the testimony of co-defendant Andino was clear that defendant shot the two victims here. Andino described in detail how he brought defendant to the scene, how defendant changed into clothes that matched those worn by the shooter, and how defendant bragged, "I hit both of them. I had a FMJ [full metal jacket bullet] in my clip [*sic*]. *** They both dropped."

¶ 60    Defendant describes this testimony as "unreliable" and "highly motivated." However, the credibility of witnesses, the weight to be given to testimony, and the inferences to be drawn from the evidence is within the province of the jury. *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 86. The jury here heard this testimony and saw Andino testify. They watched the videos that by and large corresponded with Andino's descriptions of what occurred. They also saw evidence that both defendant and Andino attempted to erase the history of their phone conversations from the afternoon in question, with defendant going so far as to factory reset his phone as police arrived at his home. While there was little physical or forensic evidence tying defendant to the shootings, we cannot say that, viewing the evidence in the light most favorable to the State, no reasonable factfinder could have found the essential elements of the crime beyond a reasonable doubt. See *Wheeler*, 226 Ill. 2d at 114. Therefore, we conclude that defendant was proven guilty beyond a reasonable doubt.

¶ 61    Defendant next contends that his sentence is excessive. A trial court has broad discretionary powers in imposing sentence, and its sentencing decisions are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). We will not disturb a sentence that

falls within the statutory range for an offense unless the trial court has abused its discretion. *People v. Campos*, 2024 IL App (2d) 230056, ¶ 54. Where a sentence falls within the statutory range, an abuse of discretion will be found where the court has imposed a sentence that greatly varies from the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense or where the sentence does not reflect adequate consideration of relevant factors in mitigation or the defendant's rehabilitative potential. *Id.* So long as the court does not ignore relevant factors in mitigation or consider improper factors in aggravation, it possesses wide latitude in imposing a sentence. *Id.* Absent some affirmative indication to the contrary beyond the sentence itself, we will presume that the court has considered all relevant evidence in mitigation. *Id.*

¶ 62 Defendant faced a statutory minimum sentence of 51 years in this case—20 years for first degree murder (see 730 ILCS 5/5-4.5-20(a) (West 2020)), a further mandatory enhancement of 25 years for use of a firearm in committing the murder (see 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020)), and 6 years for attempt (murder) (720 ILCS 5/8-4(c)(1) (West 2020)).[5] The maximum combined required sentence was 125 years—60 years for murder, 25 years for the enhancement, and 30 years for attempt (murder). The trial court sentenced defendant to 45 years for first degree murder, 25 years for the firearm enhancement (both to be served at 100%), and 29 years for attempt (murder) (to be served at 85%), for a total of 99 years. The sentences were to be served consecutively. Defendant notes that he will not be eligible to be released from prison until he is just short of his 114th birthday.

---

[5] The court declined to impose a discretionary 20-year firearm enhancement on the attempt murder charge.

¶ 63    Defendant does not contest that the sentences fall within statutory ranges. Instead, he argues that, while the trial court considered all the appropriate factors in aggravation and mitigation, the court "quickly dismissed" factors in mitigation, especially defendant's rehabilitative potential, and focused instead on the seriousness of the offense. Defendant quotes from a portion of the court's imposition of sentence in which it uses the phrases and words "devoid of humanity," "cold blooded," "evil," "depraved," and "heartless." The court then stated, "This is not a minimum case. To be clear, it's this Court's intent to impose a sentence you cannot complete. Because that's how evil what you did was." According to defendant, the court's "comments, and subsequent sentence, show that [the court] did not properly consider [defendant's] age and rehabilitative potential."

¶ 64    We disagree. The court clearly stated that it had "considered all the statutory and non-statutory factors in aggravation and mitigation including the dual Constitutional command to fashion a sentence to punish the offender for his criminal conduct *and consider his restoration to useful citizenship*." (Emphasis added.). Reduced to its essence, defendant's argument is that the trial court could have achieved its goal of "adequate retribution" by imposing the statutory minimum sentences (totaling 51 years), with release from prison at age 69, "an age where he would be unlikely to reoffend." However, the trial court is generally in a better position than a reviewing court to determine an appropriate sentence based upon the particular facts and circumstances of a case; thus, the trial court is the proper forum for the determination of a defendant's sentence. *People v. Merriweather*, 2022 IL App (4th) 210498, ¶ 32. We will not disturb on this basis the trial court's conclusion that a 99 year sentence, rather than a 51 year sentence, was appropriate.

¶ 65    Defendant also argues that his 99 year sentence is a *de facto* life sentence. The trial court stated that it intended to impose a sentence that defendant could not complete. However, defendant

cites to *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26, which related that, according to "The United States Sentencing Commission Preliminary Quarterly Data Report" (through June 30, 2012), a person held in a general prison population has a life expectancy of about 64 years. Thus, even the minimum sentence here could not be completed before defendant reached his prison life expectancy, making it, by defendant's definition, a *de facto* life sentence. However, we disagree that defendant's sentence is a *de facto* life sentence.

¶ 66 In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court held that the eighth amendment (U.S. Const., amend. VIII) "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. Our supreme court has held that, as applied to *juvenile* offenders, a sentence of imprisonment greater than 40 years is a *de facto* life sentence that runs afoul of the eighth amendment's protections against cruel and unusual punishments. See *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41. Defendant here requests that we remand the cause "for a new sentencing hearing requiring consideration of the *Miller* factors and evolving science on juvenile brain development." However, our supreme court has previously declined to extend *Miller* to offenders 18 years of age or older (see *People v. Harris*, 2018 IL 121932, ¶ 61) and recently and clearly reiterated its conclusion to "continue to hold that *Miller* only applies to juveniles and does not apply to emerging adults." *People v. Spencer*, 2025 IL 130015, ¶ 32.

¶ 67 Further, defendant was sentenced under a statutory scheme that makes him eligible for parole before he spends more than 40 years in prison. Section 5-4.5-115 of the Code of Corrections provides in relevant part:

"(b) *** A person under 21 years of age at the time of the commission of first degree murder who is sentenced on or after June 1, 2019 (the effective date of Public Act 100-

1182) shall be eligible for parole review by the Prisoner Review Board after serving 20 years or more of his or her sentence or sentences, except for those subject to a term of natural life imprisonment under Section 5-8-1 of this Code or any person subject to sentencing under subsection (c) of Section 5-4.5-105 of this Code.

\* \* \*

(j) \*\*\*

\* \* \*

In considering the factors affecting the release determination under 20 Ill. Adm. Code 1610.50(b), the Prisoner Review Board panel shall consider the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration.

\* \* \*

(m) \*\*\* [A] person denied parole under subsection (j) of this Section, who is serving a sentence or sentences for first degree murder or aggravated criminal sexual assault shall be eligible for a second and final parole review by the Prisoner Review Board 10 years after the written decision under subsection (k) of this Section." 730 ILCS 5/5-4.5-115(b), (j), (m) (West 2020).

¶ 68 Defendant was under 21 years of age on May 29, 2022, the date of the offenses. He was sentenced on November 21, 2023, after the June 1, 2019, effective date of this provision. Therefore, defendant meets the criteria to be eligible for parole review after serving 20 years of his sentence. Defendant argues that the opportunity for parole "does not negate the unconstitutional nature of [defendant's] de *facto life sentence*" and that it "is not a meaningful opportunity at release." However, the *Spencer* court has determined that, as "the statutory

provision invoked to review parole petitions for emerging adults convicted of first degree murder provides that the opportunity for release requires consideration of 'the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration,' " it allows a meaningful opportunity to obtain release before a defendant spends 40 years in prison. *Spencer*, 2025 IL 130015, ¶ 40 quoting 730 ILCS 5/5-4.5-115(j) (West 2020). Here, as defendant was sentenced under this same scheme, he was provided a meaningful opportunity to obtain release before he spends 40 years in prison; thus, he was not sentenced to a *de facto* life sentence. We find no error in the trial court's imposition of sentence in this case.

¶ 69                                  III. CONCLUSION

¶ 70    For these reasons, the judgment of the circuit court of Kane County is affirmed

¶ 71    Affirmed.

¶ 72    JUSTICE BIRKETT, specially concurring:

¶ 73    I agree with my colleagues that any error in the admission of Andino's prior consistent statement was harmless.

¶ 74    I write separately to set forth additional background that is relevant to our analysis and to distance myself from the majority holding that the trial court abused its discretion in admitting "certain items of clothing found during the search" of defendant's home.

¶ 75    On July 15, 2022, while presenting a motion to sever, defense counsel informed the trial court that "there's antagonistic statements." The trial court asked whether both defendants made statements and defendant's counsel replied, "[T]here's only one" creating a "*Bruton* issue." On November 17, 2022, defense counsel reminded the court that there was a motion to sever on file and requested a hearing date. On December 12, 2022, the State agreed to the motion to sever,

which the trial court ordered. Defense counsel informed the court that he was in contact with Andino's attorney, who was contemplating filing a motion to suppress Andino's statement, which could affect the direction of both cases. Defense counsel stated that "everything is contingent on what codefendant's position is and whether or not a new statement may be coming forth or something of that nature." The case was continued several more times for case management and to check on the status of Andino's case. On May 21, 2023, defense counsel informed the trial court that Andino had entered a plea agreement with the State in exchange for "truthful testimony."

¶ 76    During trial on August 30, 2023, just before co-defendant Andino's testimony, the trial court stated, "Okay. Anything else from either side? We talked about the scope of the cross-examination regarding the negotiation he entered into." The State informed the court that it would "front" the plea agreement during direct examination. The agreement provided that, in exchange for Andino's truthful testimony, "his murder charge was dismissed" and he "would be pleading guilty to aggravated battery with a firearm." Instead of facing "35 years to 75 years to be served at 100 percent," Andino would face a sentencing range of "6 and 30 years" in prison at "85 percent."

¶ 77    The trial court asked if either party "is potentially going to be seeking to admit some of his prior statements. Anyone want to talk about the *Miranda* issue?" The State had informed the court that it "wasn't planning going into *you spoke to police*, I'm just asking his testimony." (Emphasis in original.) The trial court then asked, "Oh, and then after the defense brings up, well, *this is your testimony after you entered into the agreement with the State*, you weren't going to try to go back—" (Emphasis in original.) The State responded, "That's what we're going to end up with." Defense counsel clarified that he had anticipated that the "State is going to bring out the prior consistent statement." Defense counsel stated, "I anticipate that they will be rehabilitation,

and my only thing is, like I said, I'm going through the timeline. I'm going to go through the timeline. I'm going to talk about the argument with the State and his eagerness to want to help all of a sudden." The trial court commented that "there's three different rules of evidence that are coming into play, impeachment by prior inconsistent statement, rehabilitation with prior consistent statement, and perhaps the completeness doctrine under, what is it, Rule 106 if portions of a statement come out." During Andino's testimony, none of the three rules mentioned by the trial court were in play.

¶ 78    During cross examination, defense counsel brought out that Andino did not tell the police what happened until he was charged. Andino agreed that he had to testify consistently with "the things [he] said before." On re-direct the State asked, "And every time that you—that you told the same—every time you spoke to somebody about your testimony, it was consistent, correct?" Andino responded, "[Y]es." Andino had not watched any of the videos before speaking with the State. On re-cross examination, defense counsel asked, "Now, if anything changes with your testimony, the deal changes, isn't that correct?" Andino said, "Yes."

¶ 79    Prior to the introduction of Andino's video recorded statement, defense counsel asked to revisit the issue and provided the trial court with a copy of *People v. Terry*, 312 Ill. App. 3d 984 (2000). Defense counsel argued that Andino's testimony established that the motive to fabricate was born when he was told that he was being charged with first degree murder. Like in *Terry*, Andino was a suspect in a homicide and the prior consistent statements were not made until after he was told he was "being charged, and from that point on he has been consistent." Defense counsel argued that, therefore, Illinois Rule of Evidence 613(c) did not apply. The State responded that "the entire cross examination dealt with our deal and that we—that he fabricated it in helping us and tailoring his testimony to our deal. So that opens the door to his prior consistent statement

that he made to police on May 31st of 2022. It's textbook." The trial court then asked if Andino made any statements "before he invokes?" The State responded, "No, I believe he denies everything." After further discussion, the trial court ruled in part:

"The Court explored with counsel outside the presence of the jury what counsel thought would be the scope of appropriate testimony either with Andino on the stand or with another witness, particularly regarding the sequence of *What did he say? When did he say it back at the stationhouse?* That included a statement prior to the invocation, the invocation, the reinitiation, the new set of warnings and then the subsequent statement.

The parties agreed that prior to the subsequent statement would not be admissible, not the warnings, not the reinitiation, all that business. The parties agreed. The Court's not disturbing that agreement.

So the question comes back to [*sic*] in a Rule 613(c) context: Was the allegation of motive to fabricate that can trigger the admissibility of a prior consistent statement? What neither side has presented to the Court is an authority where there are two such motives or at least multiple motives, but it's the Court's finding based upon the facts of this case that— and the cross-examination as it played out—that the negotiation, the agreement with the cooperating co-defendant, that Andino made with the State in the last few months, whatever it was, that was the subject of such cross-examination is at least a sufficient motive to fabricate, that it permits the admissibility of his prior statement as a prior consistent statement.

Now, so for that reason, the judgment yesterday is confirmed. But with that goes the following: It is not substantively in evidence, it's limited, which means that the Court would give the limiting instruction that counsel agreed to yesterday; and also when we get

- 32 -

to closing arguments, I expect closing arguments to conform with the purpose of that argument. And that in fact is one of the problems in the *Terry* case that Mr. Wade cited this morning is that the State improperly argued that prior consistent statement leading to reversible error in *Terry*.

So not to tell any of you what to say, but for example, an improper use of this statement at closing arguments could be something like *What he told the police was the truth, and, ladies and gentlemen, you should believe that.* A proper, potentially, use of the statement could be more something like *Consider the statement he gave the police and that's how you can judge whether he was telling the truth or not when he testified.* That can be a confusing distinction for some, but it's very important under the law.

Okay. Is the jury here?" (Emphasis in original.)

¶ 80    "The prejudicial nature of evidence of prior consistent statements is judged on a case-by-case basis." *People v. Caffey*, 205 Ill. 2d 52, 110 (2001). Our supreme court has held that, even when uncorroborated, accomplice testimony is "sufficient to sustain a conviction if it satisfies the jury of the defendant's guilt beyond a reasonable doubt." *People v. Rivera*, 166 Ill. 2d 279, 287 (1995). In this case, the testimony of Fernando Andino was corroborated by: extensive video evidence; defendant's and Andino's cell phone records; defendant's finger print recovered from the front passenger side door of Andino's BMW; the clothing recovered from defendant's home—particularly the three gloves that tested positive for gun shot residue; defendant's statement to Detective Aines that he and his mother were the only residents as 2103 Lloyd; the video of his mother's conversation with Officer Burdis, where she states that her son is missing, that she didn't know who he left with, that he changed his shirt, that she was concerned he may have been involved, that, because he left his cell phone and wallet in his bedroom, he could be identified by

a hickey on his neck; and defendant's effort to conceal evidence by hitting factory reset on his cell phone moments before being arrested.

¶ 81    "The party seeking to introduce a prior consistent statement bears the burden of establishing that the statement was made before the alleged recent fabrication or existence of the motive to testify falsely." *People v. Short*, 2014 IL App (1st) 121262, ¶ 102. Ill. R. Evid. 613(c). In its brief, the State relies on *People v. Richardson*, 348 Ill. App. 3d 796 (2004) for its argument that Andino's recorded interview was admissible as a prior consistent statement because:

> "based on the defense's cross examination of the co-defendant concerning the interplay between his initial denial of any involvement in the shooting, subsequent naming of the defendant as the shooter, and later plea agreement entered into with the State—the statement was admissible to rehabilitate the co-defendant's testimony that the defendant was the shooter against any charge that he fabricated his statement in exchange for the plea agreement." (citing *People v. Richardson*, 348 Ill. App. 3d 796, 803-04 (2004)).

The problem with the State's argument is that, in *Richardson*, it was a phone call to the witness's mother that prompted him "to speak to the police." Prior to that, the witness had been handcuffed to a wall and denied use of the restroom. Also, in *Richardson*, defense counsel's cross examination of the witness suggested "recent fabrication." The defense denied that it made "any suggestion of recent fabrication." The trial court ruled that "the plea agreement created the inference that Parker changed his testimony." *Id.* at 801. In this case, there was no charge of recent fabrication. In fact, on cross examination, Andino acknowledged that he told the police the same "story" he told on direct examination "[t]o help himself." It is clear from the record that the trial court had not watched the Andino video before ruling on its admissibility. Had it done so, it would have been apparent that Andino's motive to help himself existed before he provided his version to the police.

¶ 82    The problem with the State's argument is that, in *Richardson*, it was a phone call to the witness's mother that prompted him "to speak to the police." Prior to that, the witness had been handcuffed to a wall and denied use of the restroom. Also, in *Richardson*, defense counsel's cross examination of the witness suggested "recent fabrication." The defense denied that it made "any suggestion of recent fabrication." The trial court ruled that "the plea agreement created the inference that Parker changed his testimony." *Id.* at 801. In this case, there was no charge of recent fabrication. In fact, on cross examination, Andino acknowledged that he told the police the same "story" he told on direct examination "[t]o help himself." It is clear from the record that the trial court had not watched the Andino video before ruling on its admissibility. Had it done so, it would have been apparent that Andino's motive to help himself existed before he provided his version to the police.

¶ 83    During its ruling on the admissibility of Andino's prior consistent statement, the trial court suggested that, while the parties provided no authority "where there are two such motives" to fabricate, the agreement Andino made with the State "is at least sufficient" to permit the "admissibility of his prior statement." Our research has not revealed any cases to support the trial court's interpretation of Illinois Rule of Evidence 613(c) or the common law. In *Tome v. U.S.*, while interpreting Federal Rule of Evidence 801(d)(1)(B) (the federal rule for prior consistent statements) and the common law, the Supreme Court stated that "[p]rior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." 513 U.S. 150, 156 (1995). See *People v. Thompson*, 2016 IL 118667 (2016) ("We may look to federal law, as well as state decisions interpreting similar rules for guidance."). The fact that the plea agreement sweetened the pot for Andino's testimony did not open the door for admitting his prior consistent statement.

¶ 84    I agree with my colleagues that the trial court abused its discretion in allowing the State to play the video recording. However, the error was harmless where the State demonstrated that there is no reasonable probability that the jury would have acquitted defendant absent the error. *In re E.H.*, 224 Ill. 2d 172, 180 (2006); *People v. McBridge*, 2020 IL App (2d) 170873, ¶ 34.

¶ 85    I disagree with my colleagues that the trial court abused its discretion in admitting some items of clothing recovered from defendant's home. First, under Illinois Rule of Evidence 401, "Relevancy is 'tested in the light of logic, experience and accepted assumptions as to human behavior.' " *Voykin v. Estate of DeBoer*, 192 Ill. 2d 49, 57, 248 (2000) (quoting *Marut v. Costello*, 34 Ill. 2d 125 (1965)). Defendant and his mother were the only people that lived in the house where they resided. The fact that items of clothing matching the description of the clothes worn by the shooter has a "tendency" to show defendant was the person who shot the victims because the "shooter" came from defendant's house. In *People v. Shief*, 312 Ill. App. 3d 673 (2000), the State introduced evidence of another crime to establish the defendant's identity. The appellate court noted that "[t]he offender in each case wore clothing that was strikingly similar to clothing recovered from [the] defendant's possession." *Id.* at 682. In this case, the clothing recovered from defendant's possession was "strikingly similar" to the clothes worn by the shooter. In his brief, defendant cites no authority for the proposition that items of clothing must be specifically identified or connected to a crime in order to be relevant. "At the trial court's discretion, relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value." *People v. Sutherland*, 155 Ill. 2d 1, 19 (1992). In *Sutherland*, the defendant was charged with the murder of a 10-year-old girl. She had been stabbed. Several months later, the defendant was arrested and charged. Prior to trial, defense counsel moved to exclude "a number of knives seized from defendant's possession at the time of his arrest in Glacier National Park." *Id.* The trial court

denied the motion, stating that the knives had "some slight probative value." On appeal, our supreme court stated:

> "In this case, the victim suffered a wound approximately 14.22 centimeter in length. It is not unreasonable to think that such a wound could have been caused by a large sharp knife such as the ones in defendant's possession. Also, the choice of method of execution tends to indicate an affinity for such a weapon. Thus, the trial court found the knives probative of defendant's propensity towards possession and use of knives and determined that it was not so prejudicial as to warrant their exclusion. We agree with the trial court determination and hold that it did not abuse its discretion." *Id.* at 20.

¶ 86 Defendant argues in his brief that "the admission of these irrelevant items was improper and prejudicial as it allowed the State to argue to the jury that Jorge was the shooter because he possessed items that were similar to those items worn by the shooter. This was misleading, confusing, and prejudicial." Precisely the opposite is true. It is the similarity of the items to the clothing worn by the shooter that established the relevance of the items.

¶ 87 In *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294 (1967), the defendant was convicted of armed robbery after a bench trial. Items of clothing seized from his home ("a cap, jacket, and trousers, among other things"), which were found in a washing machine, were introduced at trial. *Id.* at 296. "The clothes found in the washing machine matched the description of those worn by the robber and the police therefore could reasonably believe that the items would aid in the identification of the culprit." *Id.* at 307.

¶ 88 In *People v. Mathes*, the Third District rejected an argument similar to defendant's, stating:

> "The second claim of error made initially by defendant Jordan, and later adopted by defendant Mathes, concerns the trial court's admission over objection of certain articles

of clothing which the victims of the armed robbery had described as being worn by their assailants and which were later recovered from the defendants when they were arrested.

The specific allegation of error concerns the fact that while the victims of the crime testified that Mathes wore a brown vinyl or leather jacket and that Jordan wore a black leather jacket on the night of the armed robbery, Mathes was arrested the next day with a black leather jacket and Jordan was found with a brown leather jacket the following day.

The arguments made by the defendants resemble the one made by the defendant in *People v. Fair* (1977), 45 Ill.App.3d 301, *** where following the defendant's conviction for armed robbery and rape, the court rejected the defendant's contention that ordinary coats (such as the one defendant was wearing at the time of arrest) can be purchased almost anywhere, that many such coats must exist in the area, and that the coat he was wearing had no particular distinguishable feature by which an identification could have positively been made.

The court in Fair believed that such arguments go to the weight to be given such evidence by the trier of fact, and not to its admissibility, and with this determination we agree.

The real issue raised by the defendants here is whether or not the victims of the armed robbery had to positively identify the coats seized from the defendants by the arresting officer as the actual garments worn by their assailants at the time of the commission of the offense or whether their testimony describing the clothing worn by the robbers served as "a sufficient nexus" for their admission as circumstantial evidence. [Citation.]

The rule in Illinois is that physical evidence may be admitted where there is evidence (either direct or circumstantial) to connect the evidence to the defendant and the crime. [Citations.]  Moreover, where there is evidence indicating that an accused possessed a weapon at the time of the offense, a similar weapon found in his possession at the time of his arrest may be admitted against him, even though not identified as the actual weapon used by him in the commission of the crime.  [Citation.]  The use of demonstrative circumstantial evidence when articles of clothing worn at the time of arrest by the defendant in a robbery prosecution are exhibited to the jury to demonstrate their conformity with the descriptions of the robber given by the witnesses is well recognized.  [Citation.]"  101 Ill. App. 3d 205 (1981), 211-12.

¶ 89   For all of the above stated reasons, I agree that the trial court's error in admitting Andino's prior consistent statement was harmless and that defendant's conviction and sentence should be affirmed.  I disagree with the majority's conclusion that the admission of some of the clothing items was error.